# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 18-40434

————

United States Court of Appeals
Fifth Circuit

**FILED**
August 5, 2019

Lyle W. Cayce
Clerk

DANIEL ENRIQUE CANTÚ,

     Plaintiff-Appellant,

v.

JAMES M. MOODY; ERIN S. LABUZ, also known as Erin S. Hayne; NATHAN HUSAK; DAVID DE LOS SANTOS; RYAN PORTER; ROSA LEE GARZA; ALFREDO BARRERA; UNITED STATES OF AMERICA; CHRISTOPHER LEE,

     Defendants-Appellees.

————

Appeal from the United States District Court
for the Southern District of Texas

————

Before CLEMENT, GRAVES, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Daniel Enrique Cantú is a member of the Texas Mexican Mafia. He says the U.S. Constitution and federal civil rights laws afford him money damages against state and federal law enforcement officers for claims arising from a drug bust. We disagree.

No. 18-40434

I.

A.

This case arises from a transnational drug-trafficking investigation. In 2010, the federal government began investigating the Texas Mexican Mafia. As part of its investigation, the government identified Jesus Rodriguez Barrientes as the gang's leader in the Rio Grande Valley. Working with state and local law enforcement, the FBI planned a sting operation as part of Barrientes's regular heroin purchases from Mexican drug smugglers.

FBI agents convinced Juan Pablo Rodriguez, a member of the Texas Mexican Mafia, to work as an informant. When Barrientes's heroin shipment arrived, Rodriguez would meet the drug smugglers at the border and then drive everyone to a drop-off location. There Rodriguez would deliver the heroin to whomever Barrientes designated as his authorized recipient.

On the morning of August 10, 2011, things went mostly according to plan. Rodriguez, accompanied by an undercover police officer, drove to the Rio Grande where he met the drug smugglers. Then, at 7:30 a.m., Rodriguez called Cantú and asked him to come to an H-E-B parking lot so they could talk in person. According to Cantú, Rodriguez did not say what he wanted to talk about.

When Cantú arrived, he parked to the left of Rodriguez's car and rolled down his passenger-side window. Rodriguez then got out of his car, went to the trunk, took out a cooler, and placed it through Cantú's open window and onto the passenger seat. "I need you to do me a favor," Rodriguez allegedly said. Cantú says he had time to ask only one question—"What are you doing?"—before forty-five law enforcement officers descended on his vehicle. One of the officers, FBI Agent David de los Santos, pulled Cantú from his car, searched him, and placed him under arrest. The cooler contained nearly two kilograms of heroin.

2

No. 18-40434

Although Cantú says he remained in his car the whole time and never touched the cooler, two federal agents swore otherwise in affidavits. FBI Agent James Moody said Cantú exited his vehicle and personally took the cooler from Rodriguez's trunk. FBI Agent Erin LaBuz said Rodriguez handed the cooler to Cantú, who personally placed it in his passenger seat.

A federal grand jury indicted Cantú, Barrientes, his wife, and two smugglers for possession of heroin with intent to distribute and conspiracy. Barrientes, his wife, and one of the smugglers pleaded guilty and were sent to federal prison. Cantú elected to stand trial. On October 31, 2013, a federal jury acquitted him. By that time, he had spent more than two years in jail.

B.

Cantú then sued a slew of defendants under *Bivens*, the Federal Tort Claims Act, § 1983, § 1985, and state law. In the complaint, he alleged twenty-one claims under the Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and various tort theories—like malicious prosecution, false arrest, false imprisonment, assault, civil conspiracy, conversion, and negligence. And he offered his theory of how he went from his bed to a grocery store to a jail cell: Forty-five officers jeopardized a sophisticated, multi-year, multi-jurisdictional sting operation aimed at a transnational gang to frame an otherwise-innocent member of the Texas Mexican Mafia in an effort "to improve each of their professional arrest and conviction rate records against drug traffickers." However far-fetched that might seem, we take Cantú's well-pleaded allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009).

Cantú alleges he was never the intended recipient of the heroin. He says Rodriguez, while driving to the H-E-B, tried and failed to get in touch with the actual recipient. So he called Cantú instead. The gravamen of Cantú's complaint is that officers who were privy to Rodriguez's audible—and Cantú's professed ignorance about why he was being called to the grocery store—knew

No. 18-40434

Cantú was not the guy who was supposed to show up that morning. Yet they permitted him to be arrested and then doubled down, fabricating facts about Cantú's behavior to create the impression he *was* the guy.

After several hearings, the district court dismissed all of Cantú's claims against all fifteen federal, state, and county defendants. It also granted Cantú's motion to voluntarily dismiss (with prejudice) his claims against the only remaining defendant—the private company that operated the prison where he was housed before trial. The court further denied Cantú's request to file a Fourth Amended Complaint. It later filed four separate dismissal orders. Cantú appealed the orders dismissing the federal, state, and county defendants.[1]

## II.

In his briefs before our Court, Cantú pursues only a subset of his claims against only a subset of the defendants—FBI Agent James Moody, FBI Agent Erin LaBuz, FBI Agent David de los Santos, and Texas DPS Officer Alfredo Barrera. He has forfeited everything else. *See United States v. Vazquez*, 899 F.3d 363, 380 n.11 (5th Cir. 2018) (holding appellant's "failure to clearly

---

[1] In his notice of appeal, Cantú says "FINAL JUDGMENT has not been entered." But in his opening brief he argues we have jurisdiction pursuant to a final judgment. Cantú does not explain the discrepancy, nor do the defendants. It's possible Cantú thought the four dismissal orders did not satisfy the separate-judgment requirement of Federal Rule of Civil Procedure 58(a). But it doesn't matter that each "order [was] denominat[ed] as an 'order,' rather than a 'judgment.'" *Local Union No. 1992 of Int'l Bhd. of Elec. Workers v. Okonite Co.*, 358 F.3d 278, 285 (3d Cir. 2004). And in all events, parties are "free to waive" Rule 58, as they have here. *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 384 (1978); *see also* FED. R. APP. P. 4(a)(7)(B); *Orr v. Plumb*, 884 F.3d 923, 931 (9th Cir. 2018). The real restriction on our jurisdiction is § 1291, which is entirely distinct from Rule 58(a). *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 379 (1981); 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2785 (3d ed. 2019) ("Rule 58 states how a judgment is entered. It does not speak to whether a judgent entered in this fashion is a 'final judgment' for purposes of appeal."). Like the parties, we have no doubt the district court's dismissal orders constitute its "final decision" under § 1291.

identify [an issue] as a potential basis for relief forfeits the argument on appeal").

We review the dismissal of Cantú's claims *de novo*. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). We start with his § 1985 claim against the federal officers. It fails under Federal Rule of Civil Procedure 12(b)(6). Second, we address his § 1983 claims against Barrera. They fail under the same standard. Third, we hold the purported *Bivens* claim against Moody and LaBuz is not cognizable.

A.

Cantú alleges the federal defendants—Moody, LaBuz, and de los Santos—conspired to violate his civil rights under 42 U.S.C. § 1985(3). But he has two problems. Under our precedent, § 1985(3) does not cover every kind of defendant. And its plain text doesn't cover every kind of conspiracy.

Our precedent holds § 1985(3) does not apply to federal officers. In *Mack v. Alexander*, 575 F.2d 488 (5th Cir. 1978) (per curiam), we concluded § 1983 and § 1985 "provide a remedy for deprivation of rights under color of state law and do not apply when the defendants are acting under color of federal law." *Id.* at 489; *accord Bethea v. Reid*, 445 F.2d 1163, 1164 (3d Cir. 1971). Other circuits have criticized that holding for failing to grapple with Supreme Court precedent. *See, e.g.*, *Iqbal v. Hasty*, 490 F.3d 143, 176 n.13 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Ogden v. United States*, 758 F.2d 1168, 1175 n.3 (7th Cir. 1985). And the Supreme Court recently assumed § 1985(3) applies to federal officers. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865–69 (2017). *Mack* may not have aged well, but we need not decide whether it remains binding on us.

Even if we were inclined to ignore *Mack*, Cantú's claim would fail for an independent reason. The relevant text of § 1985(3) criminalizes only conspiracies that involve depriving someone of "equal protection of the laws"

No. 18-40434

or "equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); *see Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). This kind of conspiracy requires some form of class-based discrimination. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834–35 (1983).

Cantú says "he belongs to a class of individuals who have felony convictions and/or were previously incarcerated." But the Supreme "Court . . . has never held that nonracial animus is sufficient." *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 281 n.2 (5th Cir. 1998). And we have held racial animus is required: "[I]n this circuit . . . the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–74 (1993); *Scott*, 463 U.S. at 835–38; *Griffin*, 403 U.S. at 104–05 (noting that § 1985(3) was passed pursuant to the Thirteenth Amendment).

Even assuming § 1985(3) covers Cantú's proffered class—convicted felons—Cantú's claims still can't survive a Rule 12(b)(6) motion. First, Cantú can't cross from "the factually neutral [to] the factually suggestive" because he doesn't link his conspiracy allegations to his status. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.5 (2007). At most, he alleges Moody and LaBuz were aware of his prior felony conviction. But the rest of his allegations suggest officers fabricated evidence against him to save the sting operation. He does not allege Moody and LaBuz's motivations were "directed specifically at [felons] as a class" or that their actions were motivated "*by reason of*" his prior conviction. *Bray*, 506 U.S. at 270. Second, Cantú can't cross from "the conclusory [to] the factual." *Twombly*, 550 U.S. at 557 n.5. His allegation that Moody and LaBuz "[d]iscussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence . . . in order to have [Cantú] convicted" is conclusory. It

6

amounts to "nothing more than a formulaic recitation of the elements" of his claim. *Iqbal*, 556 U.S. at 681 (quotation omitted).

There's an even easier answer for Agent de los Santos. Cantú singles him out as the officer who removed Cantú from his vehicle, arrested and searched him, and then drove him to the FBI building. Cantú makes no allegation—not even a conclusory one—that de los Santos formed any kind of agreement with Moody, LaBuz, or anyone else. He doesn't even allege that de los Santos was privy to Rodriguez's last-minute change of plans to call Cantú. By Cantú's own account, de los Santos was simply the tip of the spear in the final phase of the sting operation. The district court was correct to dismiss the § 1985(3) claims.

B.

Cantú presses several § 1983 claims against Texas DPS Officer Barrera. First, he argues Barrera conspired to violate Cantú's civil rights. He alleges Barrera helped federal officers conduct the larger investigation and identified someone other than Cantú as "the person to receive the heroin" on the morning of the sting operation. As with his § 1985(3) claim against de los Santos, however, Cantú nowhere alleges Barrera formed any kind of agreement with anyone. Nor does he say Barrera learned about what transpired on the phone call between Rodriguez and Cantú.

Next, Cantú argues Barrera maliciously prosecuted him in violation of the Fourth Amendment and fabricated evidence against him in violation of the

7

No. 18-40434

Fourth and Fourteenth Amendments.[2]  Both claims against Barrera fail for the same reason the conspiracy claim does.  Cantú claims Barrera "[m]aliciously initiated a criminal case against [him] . . . without probable cause."  He also claims Barrera intentionally or recklessly falsified facts "in order to fabricate evidence and/or establish probable cause."  These are all conclusions without any factual allegations to support them.  *See Iqbal*, 556 U.S. at 681.  Cantú never says *how* Barrera falsified evidence or participated in the decision to prosecute him.  What's more, his only concrete allegations point the other way because Barrera briefed investigators on nabbing someone else—the unknown intended recipient.

We need not decide whether Cantú can bring a separately cognizable Fourteenth Amendment claim for fabrication of evidence against Barrera after *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), and *Jauch v. Choctaw County*, 874 F.3d 425 (5th Cir. 2017).  It's unclear whether he appealed or forfeited that claim.  And his allegations are conclusory and hence insufficient in any event.

---

[2] Litigants (and courts) often write and speak about § 1983 claims as if the plaintiff asserts a common-law tort action, like malicious prosecution.  This habit is not a profile in precision.  In a § 1983 case, the plaintiff must assert someone violated the Constitution or other federal law.  *See* 42 U.S.C. § 1983.  And we have no federal general common law.  *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  That's why "[t]he first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion); *see also Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) (en banc) (holding "no such freestanding constitutional right to be free from malicious prosecution exists").  Courts consider common law tort analogues to constitutional claims because those analogues may furnish things like the accrual rules for the applicable limitations period.  *See Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017) ("In defining the contours and prerequisites of a § 1983 claim, including its rule of accrual, courts are to look first to the common law of torts.").  Although Cantú brings a "fabrication of evidence" claim and a "malicious prosecution" claim, he is really arguing Barrera violated the Fourth Amendment in two different ways.  *See id.* at 921–22 (recognizing the claim fell under the Fourth Amendment regardless of whether it should be likened to malicious prosecution or false arrest).

No. 18-40434

## C.

Cantú also brings a would-be cause of action against Moody and LaBuz under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He says they violated the Fourth Amendment by fabricating evidence against him.[3] From a pleading standpoint, Cantú's strongest allegations are that Moody and LaBuz lied to justify seizing him. But *Bivens* does not provide a vehicle to bring that claim.

### 1.

As the Supreme Court recently reminded us, *Bivens* is the byproduct of an "*ancien regime.*" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quotation omitted). In 1971, the Court recognized an implied cause of action to sue federal officers for violating an arrestee's "rights of privacy" by "manacl[ing] petitioner in front of his wife and children," "threaten[ing] to arrest the entire family," and strip searching him. *Bivens*, 403 U.S. at 389–90. In the next nine years, the Court recognized two more implied causes of action under *Bivens*: a Fifth Amendment equal protection claim for employment discrimination by a congressman, *see Davis v. Passman*, 442 U.S. 228 (1979), and an Eighth Amendment claim for inadequate medical care by federal jailers, *see Carlson v. Green*, 446 U.S. 14 (1980).

Since 1980, however, "the Court has refused" every *Bivens* claim presented to it. *Abbasi*, 137 S. Ct. at 1857; *see also ibid.* (collecting cases). The Court has emphasized that *Bivens*, *Davis*, and *Carlson* remain good law. *See id.* at 1856–57. At the same time, "it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Id.*

---

[3] Cantú also sued Moody and LaBuz under the Fifth-Amendment-by-way-of-*Bivens*. We reject that claim for the same reason we reject his Fourteenth Amendment claim against Barrera: It is unclear whether he appealed the Fifth Amendment claim at all; the phrase "Fifth Amendment" appears nowhere in the argument of his opening brief. And his allegations to support that claim are conclusory in all events.

at 1856.  And it has admonished us to exercise "caution" in the "disfavored judicial activity" of extending *Bivens* to any new set of facts.  *Id.* at 1857 (quotations omitted).

So, before allowing Cantú to sue under *Bivens*, we must ask two questions.  First, do Cantú's claims fall into one of the three existing *Bivens* actions?  Second, if not, should we recognize a new *Bivens* action here?  The answer to both questions is no.

Cantú purports to address the first question.  And he thinks he's home free because his malicious-prosecution-type-claim alleges a violation of his Fourth Amendment right to be free from unlawful seizures—the same right recognized in *Bivens*.  That's wrong.  Courts do not define a *Bivens* cause of action at the level of "the Fourth Amendment" or even at the level of "the unreasonable-searches-and-seizures clause." *See FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994).

Here's an example.  No one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action.  The Supreme Court rejected a claim under the same clause of the same amendment nine years later. *See Schweiker v. Chilicky*, 487 U.S. 412, 420 (1988) (denying a *Bivens* action under the Fifth Amendment's Due Process Clause for wrongful denial of Social Security disability benefits).  Not even the *Schweiker* dissenters suggested *Davis* settled the question before the Court. *See id.* at 431–32 (Brennan, J., dissenting).

What if a plaintiff asserts a violation of the same clause of the same amendment *in the same way*? That still doesn't cut it.  In *Chappell v. Wallace*, 462 U.S. 296 (1983), the Supreme Court rejected a Fifth Amendment Due Process claim for unlawful termination (the claim at issue in *Davis*) because the plaintiff was a military servicemember rather than a congressional

employee.  *Id.* at 305.  The Court has done the same thing in the Eighth Amendment cruel-and-unusual-punishment context.  *Compare Carlson*, 446 U.S. at 17–18 (recognizing *Bivens* action—against federal prison officials—for failure to provide medical treatment), *with Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (rejecting *Bivens* action—against private prison officials— for failure to provide medical treatment).  Naturally, these principles apply in the Fourth Amendment context too.  *See, e.g., Alvarez v. ICE*, 818 F.3d 1194, 1199, 1206 (11th Cir. 2016) (treating plaintiff's *Bivens* claim for unreasonable seizure as a "new" one); *id.* at 1218 n.12 (Pryor, J., concurring in part and dissenting in part) (same); *De La Paz v. Coy*, 786 F.3d 367, 375 (5th Cir. 2015) (same); *cf. Arevalo v. Woods*, 811 F.2d 487, 489–90 (9th Cir. 1987) (barring plaintiff's *Bivens* claim for unreasonable search and seizure).

The Supreme Court recently addressed this threshold question.  And it rejected just this sort of "same right" reasoning.  In *Abbasi*, the Second Circuit had created a two-part test to determine whether a *Bivens* claim was novel: "First, it asked whether the asserted constitutional right was at issue in a previous *Bivens* case.  Second, it asked whether the mechanism of injury was the same mechanism of injury in a previous *Bivens* case."  137 S. Ct. at 1859 (citation omitted); *see Turkmen v. Hasty*, 789 F.3d 218, 235 (2d Cir. 2015) (concluding plaintiffs' condition-of-confinement claim "stands firmly within a familiar *Bivens* context").  The Court rejected that approach, pointing to *Chappell* and *Malesko*.  "The proper test," it said, is simply whether "the case is different in a meaningful way from previous *Bivens* cases."  *Abbasi*, 137 S. Ct. at 1859.

The Court then provided a non-exhaustive list of "differences that are meaningful enough to make a given context a new one":

> A case might differ in a meaningful way because of [1] the rank of
> the officers involved; [2] the constitutional right at issue; [3] the

generality or specificity of the official action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5] the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or [7] the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. In the wake of *Abbasi*, our Court and at least one of our sister circuits have rejected new Fourth Amendment claims under *Bivens*. *See Hernandez v. Mesa*, 885 F.3d 811, 816–17 (5th Cir. 2018) (en banc); *Tun-Cos v. Perrotte*, 922 F.3d 514, 517–18 (4th Cir. 2019).

2.

By any measure, Cantú's claims are meaningfully different from the Fourth Amendment claim at issue in *Bivens*. He does not allege the officers entered his home without a warrant or violated his rights of privacy. Rather, Cantú alleges Moody and LaBuz violated the Fourth Amendment by falsely stating in affidavits that Cantú willingly took possession of the cooler . . . to suggest he knowingly participated in a drug transaction . . . to induce prosecutors to charge him . . . to cause Cantú to be seized. *See Wilkie v. Robbins*, 551 U.S. 537, 552 n.6 (2007). This claim involves different conduct by different officers from a different agency. The officers' alleged conduct is specific in one sense: They allegedly falsified affidavits. But it's general in another: Cantú claims Moody and LaBuz induced prosecutors to charge him without any basis, which led to unjustified detention. The connection between the officers' conduct and the injury thus involves intellectual leaps that a textbook forcible seizure never does. *See Hartman v. Moore*, 547 U.S. 250, 259–62 (2006). "Judicial guidance" differs across the various kinds of Fourth Amendment violations—like seizures by deadly force, searches by wiretap, *Terry* stops, executions of warrants, seizures without legal process ("false arrest"), seizures with wrongful legal process ("malicious prosecution"), etc.

This is therefore a new context, and Cantú's claims cannot be shoehorned into *Bivens*, *Davis*, or *Carlson*.

The second question is whether we should engage in the "disfavored judicial activity" of recognizing a new *Bivens* action. *Id.* at 1857 (quotation omitted). Again, no. There are legion "special factors" counseling that result. One is the existence of a statutory scheme for torts committed by federal officers. *See* 28 U.S.C. § 2680(h); *Abbasi*, 137 S. Ct. at 1858 (noting "that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action"). Another is the length of time Congress has gone without statutorily creating a *Bivens*-type remedy for this context. Because Congress has long been on notice that the Supreme Court is disinclined to extend *Bivens* to new contexts, *see Abbasi*, 137 S. Ct. at 1857, its "failure to provide a damages remedy" here suggests "more than mere oversight," *id.* at 1862; *see also De La Paz*, 786 F.3d at 377 (noting Congress had not created a damages remedy against immigration agents despite legislative attention to immigration matters).

A final special factor counseling hesitation is the nature of the underlying federal law enforcement activity. While *Bivens* involved an investigation into seemingly local conduct, this case involves a multi-jurisdictional investigation into transnational organized crime committed by a violent gang that has wreaked havoc along our border with Mexico. This case therefore implicates the security of our international border. *Cf. Abassi*, 137 S. Ct. at 1861 (identifying national security as a special factor); *Meshal v. Higgenbotham*, 804 F.3d 417, 430–31 (D.C. Cir. 2015) (Kavanaugh, J., concurring) (same). If members of the Texas Mexican Mafia want a damages suit—including potentially burdensome discovery—regarding complicated investigations such as this one, that request must be made to Congress not the courts. *See Abbasi*, 137 S. Ct. at 1860–61 (discussing discovery and litigation costs as a special factor).

13

No. 18-40434

In the face of these considerations, "courts may not create [a cause of action], no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *see also Malesko*, 534 U.S. at 75 (Scalia, J., concurring).[4]

## III.

Finally, Cantú appeals the denial of leave to file a fourth amended complaint. The district court denied leave because Cantú already had numerous opportunities to amend his complaint, and the proposed amended complaint contained claims that Cantú's counsel previously agreed to remove. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that "undue delay," "bad faith," "dilatory motive," and "repeated failure to cure deficiencies by amendments previously allowed" are grounds for denying leave to amend a complaint). The district court did not abuse its discretion in denying Cantú's motion.

AFFIRMED.

---

[4] Our dissenting colleague takes issue with our analysis in two ways. First, Judge Graves notes this case is factually distinguishable from *Abbasi*. *See post*, at 15–17 (Graves, J., dissenting in part). But mere distinguishability is irrelevant; were it otherwise, federal courts would be free to infer *Bivens* actions in any case not involving post-9/11 detention policies. And we know that's wrong. *See Abbasi*, 137 S. Ct. at 1857 (noting such lawmaking is a "'disfavored' judicial activity"). Second, Judge Graves notes the FTCA might not provide a remedy to Cantú. *See post*, at 17 (Graves, J., dissenting in part). Fair enough. But the Supreme Court has said that possibility is insufficient to warrant the judicial creation of a *Bivens* action—after all, it could be evidence that Congress chose not to afford a remedy. *See Abbasi*, 137 S. Ct. at 1858–59, 1865.

No. 18-40434

JAMES E. GRAVES, JR., Circuit Judge, dissenting in part:

I respectfully dissent from the majority's opinion insofar as it concludes there is no *Bivens* cause of action for fabrication of evidence.

I agree with the majority's conclusion that Cantú's claim of malicious prosecution/fabrication of evidence presents a "new context" for a *Bivens* claim under Supreme Court precedent. However, while the majority concludes several special factors counsel against recognizing a new claim, I would reach the opposite conclusion and determine no such factors dictate against recognizing a new *Bivens* action here.

*Abbasi* instructs courts to focus the "special factors" inquiry "on maintaining the separation of powers: 'separation-of-powers principles are or should be central to the analysis.'" *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018) (*en banc*) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017)), *cert. granted,* No. 17-1678, 2019 WL 2257285 (U.S. May 28, 2019). Essentially, courts need to consider whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Abassi*, 137 S. Ct. at 1858. If there are, "the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.*

Some of the factors the Supreme Court considered in *Abassi* which counseled against recognizing a *Bivens* action were that the plaintiffs were suing high level Executive Officials for the acts of their subordinates, the lawsuit challenged "the formulation and implementation of a general policy," and the claim implicated "sensitive issues of national security." *Id.* at 1860–61. These factors meant the plaintiffs were going beyond challenging "standard 'law enforcement operations'" and were challenging "major elements of the Government's whole response to the September 11 attacks." *Id.* at 1861. As a

result, the Court found it prudent to decline to create a new claim and instead deferred to the Executive Branch's authority in military and national security affairs, as well as to Congress' ability to designate a specific channel for the courts to review such authority. *Id.*

No such concerns are present in this case. Here, Cantú seeks to hold accountable two individual law enforcement officers who allegedly lied to support a finding of probable cause and a grand jury indictment, thereby leading to his prosecution and two years of imprisonment. This is exactly the type of run-of-the-mill "law enforcement overreach" claim *Abassi* emphasized could still be recognized under *Bivens. Abassi*, 137 S. Ct. at 1862. In the instant case, there are no national security concerns,[1] no broad governmental policies at stake, and no high-level executive officials being sued for the actions of their subordinates. Nor is the giving of affidavits by law enforcement officials a heavily regulated area closely overseen by Congress so as to suggest Congress prefers courts not to interfere. *See Hernandez*, 885 F.3d at 820 (noting Congressional silence may be relevant "especially where 'Congressional interest' in an issue 'has been frequent and intense'" (quoting *Abassi*, 137 S.Ct. at 1862)). Lastly, the legal standards for adjudicating this type of claim are well established and easily administrable," meaning it is a "workable cause of action." *Wilkie v.* Robbins, 551 U.S. 537, 555 (2007); *see also Lanuza v. Love*, 899 F.3d 1019, 1033 (9th Cir. 2018) (discussing judicial administrability of a *Bivens* claim for fabrication of evidence in an immigration context); *Engel v.*

---

[1] While the majority characterizes the investigation at issue in this case as a multi-jurisdictional investigation into transnational organized crime necessarily involving the security of our international border, the Government has not argued that this case implicates any national security interests. In fact, the Government's main argument against recognizing a *Bivens* action here is that Cantú could have filed suit under the Federal Tort Claims Act. *See* discussion *infra*. Given the Government's ability to articulate its own interests, I would decline to create a national security concern where the Government has not alleged one.

*Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (discussing judicial administrability of a *Bivens* claims for *Brady* violations).

Moreover, while the Government argues that Cantú may have other remedies available through the Federal Tort Claims Act ("FTCA"), the FTCA does not provide remedies for constitutional violations. *See* 28 U.S.C. § 2679(b)(2)(A) (stating FTCA "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States . . . ."). Nor would an injunction here remedy the alleged constitutional violation, assuming Cantú even had standing to pursue one. This is essentially a "damages or nothing" case, where the very nature of Cantú's allegations "are difficult to address except by way of damages after the fact." *Abassi*, 137 S. Ct. at 1862. While recognizing a *Bivens* claim may be a "disfavored judicial remedy" these days, it is still a judicial remedy, available in certain circumstances where special factors are not present. *See Lanuza*, 899 F.3d at 1021 (recognizing the availability of new *Bivens* claims even after *Abassi*). Such is the case here.

Having recognized a *Bivens* cause of action, I would then conclude that Cantú adequately alleged such a claim. Accordingly, I dissent from the majority's opinion on this issue.