# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3461

_____

Hawo O. Ahmed

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

_____

No. 18-3471

_____

Hamdi A. Mohamud

*Plaintiff - Appellee*

v.

Heather Weyker, in her individual capacity as a St. Paul Police Officer

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: June 18, 2020
Filed: December 23, 2020

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

The plaintiffs are trying to hold a rogue law-enforcement officer responsible for landing them in jail through lies and manipulation. But for us, a more fundamental question is at stake: who gets to make the call about whether a federal remedy is available? As we recently held, the decision lies with Congress, not us, so we vacate the district court's ruling. *See Farah v. Weyker*, 926 F.3d 492 (8th Cir. 2019).

I.

This appeal is another chapter in the aftermath of an investigation into an alleged interstate sex-trafficking scheme that was plagued with problems from the start. Of the thirty people who were indicted, *United States v. Adan*, 913 F. Supp. 2d 555, 558–59 (M.D. Tenn. 2012), only nine were ultimately tried, *United States v. Fahra*, 643 F. App'x 480, 483 (6th Cir. 2016), and each was acquitted, *id.* at 484. Since then, numerous civil-rights complaints have been filed against St. Paul Police Officer Heather Weyker for her conduct during the investigation.

A.

Two of those complaints were filed by Hawo Ahmed and Hamdi Mohamud. They, along with their friend Ifrah Yassin, were attacked one evening at an apartment building in Minneapolis. Their attacker was Muna Abdulkadir, a witness for the government in the sex-trafficking case. During the incident, Abdulkadir "smash[ed]" Ahmed's windshield and "struck" Yassin, all while "brandishing [a] knife." Following the attack, Ahmed and Mohamud called 911, and Abdulkadir made a call of her own to Weyker. Worried about the possibility of losing a witness, Weyker sprang into action.

-2-

She first contacted Minneapolis Police Officer Anthijuan Beeks, who responded to the 911 call. Weyker told him that she had "information and documentation" that Ahmed, Mohamud, and Yassin "had been actively seeking out Abdulkadir" in an effort "to intimidate" her for agreeing to cooperate in a federal investigation.

Abdulkadir was indeed a federal witness, but everything else Weyker said was "untrue." She had no "'information' or 'documentation.'" Rather, she just wanted to "shield[] Abdulkadir from arrest" to "further incentiv[ize] . . . her" continued participation in the investigation. The plan worked. Officer Beeks arrested Ahmed, Mohamud, and Yassin "on suspicion of tampering with a federal witness," *see* 18 U.S.C. § 1513(b), based "on Weyker's intentional misrepresentations."

Weyker did not stop there. The next day, she prepared a criminal complaint and a sworn affidavit. In doing so, she once again "fabricated facts, knowingly relayed false information, and withheld exculpatory facts, all with the intention that [the three women] would continue [to be] detained for crimes [for] which she knew there [was] no actual probable cause or arguable probable cause."

These actions were not without consequences. Mohamud, a minor at the time, spent just short of 25 months in federal custody, with a "small portion" of it on supervised release. Ahmed gave birth during the more than 25 months she spent in custody. Eventually, the government dismissed the case against Mohamud, and a jury acquitted Ahmed.

After their release, both women sued Weyker in her individual capacity on one overarching false-arrest theory. *See* U.S. Const. amend. IV; *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *Small v. McCrystal*, 708 F.3d 997, 1006 (8th Cir. 2013). Due to Weyker's dual status, they pleaded two causes of action against her: one as a St. Paul police officer, *see* 42 U.S.C. § 1983, and another as a

deputized federal agent, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

Weyker asked the district court to dismiss both claims. *See* Fed. R. Civ. P. 12(b)(6). One reason was qualified immunity: the requirement that any right she may have violated had to be clearly established. *See Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc). The other was based on the limited availability of a cause of action against federal officers. *See Bivens*, 403 U.S. at 397. The district court allowed both claims to move forward, concluding both that qualified immunity was unavailable and that the plaintiffs had a cause of action against Weyker.[1]

B.

Just last year, we decided a nearly identical case that also involved Weyker. *See Farah*, 926 F.3d 492. Five of the plaintiffs had been charged and detained as suspected participants in the sex-trafficking scheme. *Id.* at 496–97. Some were acquitted following a trial, and the government dropped the charges against the others. *Id.* at 496. All, however, accused Weyker of "exaggerating and inventing facts in reports[;] hiding [exculpatory] evidence"; manipulating witnesses; and "deceiv[ing] prosecutors, the grand jury, and other investigators" along the way. *Id.* at 496–97. Like Ahmed and Mohamud, they sought relief under both *Bivens* and

---

[1]For this reason, the availability of a *Bivens* action is squarely before us on appeal. Indeed, Weyker has argued all along that the plaintiffs do not have a cause of action against her as a deputized federal officer. *See* Defendant's Memorandum in Support of Motion to Dismiss at 37–47, 0:17-cv-02070-JNE-TNL (D. Minn. Oct. 20, 2017), ECF No. 19; *see also* Plaintiff Mohamud's & Plaintiff Ahmed's Memorandum of Law Opposing Defendant's Motion to Dismiss at 15–16, 0:17-cv-02070-JNE-TNL (D. Minn. Dec. 4, 2017), ECF No. 25. It is also her lead argument on appeal. *See* Consolidated Br. for the Appellant at 13–26; *see also* Consolidated Response Br. for the Appellees at 12–15. To the extent that the dissent has second thoughts about our decision to reach this issue now, *Farah* all but settled that we can. 926 F.3d at 497, 502–03, 503 n.1 (treating the *Bivens* issue in a similar posture as a "threshold question" and declining to decide qualified immunity first).

section 1983.  *Id.* at 497.  We held that, if Weyker was acting as a federal officer at the time, no cause of action was available.  *Id.* at 502.  We then remanded for consideration of whether the plaintiffs could proceed under section 1983.  *Id.* at 502–03.

Yassin was the final plaintiff in the case.  *See id.*  We never decided whether an implied cause of action was available to her because Weyker never "meaningfully briefed" the issue.  *Id.* at 503.  Today, Weyker asks us to answer the question that we left open in *Farah*.

## II.

We now address this "threshold question": whether an implied cause of action is available to Ahmed and Mohamud under the Constitution itself, more commonly known as a "*Bivens* action."  *Hernandez v. Mesa*, 140 S. Ct. 735, 742–43 (2020); *Farah*, 926 F.3d at 497; *see Bivens*, 403 U.S. at 397.  Answering it calls for "a two-step inquiry," *Hernandez*, 140 S. Ct. at 743, over which our review is de novo, *Farah*, 926 F.3d at 497.  At the motion-to-dismiss stage, we assume that all factual allegations in their complaints are true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.

"On only three occasions has the Supreme Court [recognized] a cause of action under *Bivens*."  *Farah*, 926 F.3d at 497; *see Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979); *Bivens*, 403 U.S. 388.  Expanding *Bivens* is, according to the Supreme Court, "now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Iqbal*, 556 U.S. at 675); *see also Hernandez*, 140 S. Ct. at 743 ("[F]or almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*.").  The reason is that the separation of powers generally vests the power to create new causes of action in Congress, not us.  *See, e.g.*, *Hernandez*, 140 S. Ct. at 742; *Abbasi*, 137 S. Ct. at 1857.

With this presumption against creating new *Bivens* actions in mind, *Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005), our analysis has two steps. Under step one, if a case "present[s] one of the three *Bivens* claims the [Supreme] Court has approved in the past," it "may proceed." *Farah*, 926 F.3d at 498 (internal quotation marks omitted). If it does not, then we go on to the next step. *Id.*

At step two, the question is whether "any special factors counsel hesitation before implying a new cause of action." *Id.* (internal quotation marks and brackets omitted). If there is "reason to pause before applying *Bivens* in a new context or to a new class of defendants[,] we [must] reject the request." *Hernandez*, 140 S. Ct. at 743.

B.

Just as we concluded in *Farah*, "[n]o Supreme Court case exactly mirrors the facts and legal issues presented here." 926 F.3d at 498. Neither *Carlson* nor *Davis* is a match, which leaves *Bivens* as the only possibility. *See Carlson*, 446 U.S. at 16–18, 16 n.1 (allowing a cruel-and-unusual-punishment claim to proceed after prison officials fatally mishandled an inmate's serious asthmatic condition); *Davis*, 442 U.S. at 235–36, 243–44 (recognizing a cause of action for a sex-discrimination claim under the Fifth Amendment).

1.

The claims in *Bivens* arose out of a warrantless search and an illegal arrest. 403 U.S. at 389. Specifically, federal law-enforcement officers had "threatened to arrest [Bivens's] entire family" as they shackled him; "searched [his] apartment from stem to stern"; and after booking and interrogating him, "subjected [him] to a visual strip search." *Id.*; *see Abbasi*, 137 S. Ct. at 1860 (describing the case as "a claim against FBI agents for handcuffing a man in his own home without a warrant"). Under those circumstances, the Supreme Court held that he had "a cause of action

[against the officers] under the Fourth Amendment" and that "money damages" were potentially available "for any injuries he ha[d] suffered." *Bivens*, 403 U.S. at 397.

Our task is to determine whether *this* "case is different in a meaningful way from . . . *Bivens*." *See Abbasi*, 137 S. Ct. at 1859. As we explained in *Farah*, relevant differences can include, among other things, "the sorts of actions being challenged, the mechanism of injury, and the kinds of proof those injuries would require." 926 F.3d at 500; *see also Abbasi*, 137 S. Ct. at 1859–60 (providing "examples" of differences without establishing "an exhaustive list"). Even "small" differences can be "meaningful." *Abbasi*, 137 S. Ct. at 1865 (calling this step "eas[y to] satisf[y]"); *see Hernandez*, 140 S. Ct. at 743 ("[O]ur understanding of a 'new context' is broad."). The case before us is meaningfully different from *Bivens* in four ways.

First, "the sorts of actions being challenged" here are different. *Farah*, 926 F.3d at 500. The focus in *Bivens* was on an invasion into a home and the officers' behavior once they got there. 403 U.S. at 389. Here, by contrast, Weyker did not enter a home, even if the actions she allegedly took—like manufacturing evidence and lying—were just as pernicious. *Farah*, 926 F.3d at 499; *see also Franks*, 438 U.S. at 155–56 (holding that fabricating probable cause through material and knowingly false information in a warrant application violates the Fourth Amendment); *Small*, 708 F.3d at 1006 (explaining that an officer violates an individual's Fourth Amendment rights when he persuades someone else that there is probable cause "based solely on information the officer knew to be false" (quotation marks omitted)). Lying and manipulation, however bad they might be, are simply not the same as the physical invasions that were at the heart of *Bivens*. *See Farah*, 926 F.3d at 499; *cf. Canada v. United States,* 950 F.3d 299, 307 (5th Cir. 2020) (holding that the Supreme Court's prior *Bivens* cases were meaningfully different from a situation in which IRS agents had "intentionally manipulated a penalty assessment").

Second, and closely related, Weyker's role in the arrests was different. In contrast to the officers in *Bivens*, she did not arrest anyone herself, nor was she even on the scene when the arrests occurred. *See Abbasi*, 137 S. Ct. at 1859–60 (listing "the generality or specificity of the official action" as a meaningful potential difference). Rather, she provided allegedly false information to another officer in a different police department, who then arrested the plaintiffs. *See Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) (holding that a "claim involv[ing] different conduct by different officers from a different agency" than in *Bivens* presented a new context). In this way, Weyker's actions fell somewhere along the spectrum between a *Franks*-type violation and a simple warrantless arrest. *Compare Franks*, 438 U.S. at 155–56 (involving a situation in which an officer makes "a false statement knowingly and intentionally, or with reckless disregard for the truth"), *with District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence."). Not only is this factual difference from *Bivens* meaningful, it also narrows the doctrinal divide between a false-affidavit theory, which the dissent concedes is foreclosed by *Farah*, and one based solely on the initial arrest itself.

Third, although "the mechanism of injury" is a closer call, there is still one meaningful difference. *Farah*, 926 F.3d at 499. In *Bivens*, the injuries included "humiliation, embarrassment, and mental suffering [that] were directly caused by the officers' conduct." *Id.* (internal quotation marks omitted). Ahmed and Mohamud suffered these same injuries, but the "direct[] caus[al]" chain is missing. *Id.* Multiple "independent legal actors"—Officer Weyker, Officer Beeks, and even prosecutors—played a role.[2] *Id.* Indeed, the dissent concedes as much by invoking the collective-knowledge doctrine. *See United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (explaining the collective-knowledge doctrine, which involves

[2]We read the plaintiffs' allegations as primarily concerned with the role that Weyker played in their *arrests*. To the extent they seek "damages arising out of [their] post-arrest indictment[s]," any such "claim must proceed, if at all, under section 1983." *Farah*, 926 F.3d at 503 n.2.

multiple actors). Even though it is true that "the mechanism of injury" is less attenuated here than in *Farah*, which involved "a series of intervening steps," the claims are still less "straightforward" than in *Bivens*. *Farah*, 926 F.3d at 499.

Fourth, proving these claims would require a different type of showing. *Abbasi*, 137 S. Ct. at 1860. For the allegedly false affidavit, Ahmed and Mohamud would have to establish that (1) Weyker's statements were false; (2) she made them "knowingly and intentionally, or with reckless disregard [for] the truth"; and (3) without them, there would be no probable cause. *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014) (quotation marks omitted); *see Haywood v. City of Chicago*, 378 F.3d 714, 719–20 (7th Cir. 2004) (applying *Franks* to misrepresentations made in the context of continued detention). *Bivens* did not require this type of fact-checking and conscience-probing, 403 U.S. at 389; *Farah*, 926 F.3d at 499, which can, as the Supreme Court has warned, impose "substantial costs," *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). Similarly, for the arrest itself, there would have to be an examination into whether Officers Beeks would have had probable cause to arrest the plaintiffs in the absence of Weyker's allegedly false information. *See Green v. Nocciero*, 676 F.3d 748, 754–55 (8th Cir. 2012); *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 814–18 (8th Cir. 2010); *see also Smoak v. Hall*, 460 F.3d 768, 779–80 (6th Cir. 2006) (explaining that whether reasonable suspicion existed depended on "the facts known to the . . . troopers who actually participated in the seizure," not simply what the dispatchers, who relayed misleading and incomplete information, told them). Although it would not quite rise to the level of conscience-probing, it would still require fact-checking what Beeks knew and when. *See Green*, 676 F.3d at 754–55; *Fisher*, 619 F.3d at 814–18. No comparable inquiry was in play in *Bivens*. 403 U.S. at 389 (involving actions only by the arresting officers).

2.

When one or more meaningful differences exist, it is not enough to identify a few similarities. The plaintiffs and dissent make much of the fact that this case, like

*Bivens*, arose out of an allegedly illegal arrest. But "a modest extension is still an extension," *Abbasi*, 137 S. Ct. at 1864, even if it involves "the same constitutional provision," *Hernandez*, 140 S. Ct. at 743.

If the test sounds strict, it is. As an example, the Supreme Court refused to recognize an implied cause of action for a claim of inadequate medical treatment against officers in a *privately* contracted prison, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63–64, 73–74 (2001), even though it had previously recognized an identical claim against a prison guard in a *federally* run prison, *Carlson*, 446 U.S. at 16–18. *See Hernandez*, 140 S. Ct. at 743 (comparing *Carlson* and *Malesko* on this basis). If *Malesko* was a new context, then this case is too. *See Farah*, 926 F.3d at 498–500; *see also Abbasi*, 137 S. Ct. at 1856 (explaining that the Supreme Court had "no[] inten[t] to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure *context in which it arose*" (emphasis added)); *Cantú*, 933 F.3d at 423 (concluding that an unlawful-seizure claim under the Fourth Amendment presented a new context when the plaintiff alleged that officers "falsified affidavits," rather than "entered [a] home without a warrant").

C.

At step two, the task is to determine whether, in this new context, an implied cause of action is available. The focus is on whether there are any "special factors" that "cause[] [us] to pause before acting without express congressional authorization." *Abbasi*, 137 S. Ct. at 1857–58 (quotation marks omitted). "It does not take much," *Farah*, 926 F.3d at 500, because Congress is usually "in the better position" to weigh the costs and benefits of creating "a new substantive legal liability," *id.* (quoting *Abbasi*, 137 S. Ct. at 1857). On this point, *Farah* once again does much of the heavy lifting. *Id.*

Just like in *Farah*, a trial would "risk . . . burdening and interfering with the executive branch's investigative . . . functions." *Id.* Perhaps the *level* of interference would be less than in *Farah*, as the plaintiffs argue, but a jury would still need to

determine what Weyker knew, what she did not know, and her state of mind at the time. *Williams*, 772 F.3d at 1311. There are, as we explain above, "substantial costs" associated with requiring public officials to litigate these types of issues, including "the diversion" of public resources and deterring "able citizens from . . . public office." *See Harlow*, 457 U.S. at 814, 816. It may well be that the costs are worth it, but Congress is better equipped than we are to make the call. *Farah*, 926 F.3d at 501.

Moreover, as in *Farah*, other remedies are available "to address injuries of the sort the plaintiffs have alleged[]." *Id.* "The so-called Hyde Amendment allows courts to award attorney fees to criminal defendants who prevail against 'vexatious, frivolous, or . . . bad[-]faith' positions taken by the government." *Id.* (quoting Act of Nov. 26, 1997, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (codified at 18 U.S.C. § 3006A note)). And for "those who are wrongly convicted and sentenced," damages may be available. *Id.* (citing 28 U.S.C. § 1495). We are especially reluctant to supplement those remedies with our own, which could upset the existing remedial structure. *Abbasi*, 137 S. Ct. at 1858; *Farah*, 926 F.3d at 501–02. This factor alone, as the Supreme Court has explained, is "a convincing reason" not to extend *Bivens*. *Abbasi*, 137 S. Ct. at 1858 (quotation marks omitted).

None of this should be surprising. After all, the Supreme Court has not recognized a new *Bivens* action "for almost 40 years." *Hernandez*, 140 S. Ct. at 743; *see also Abbasi*, 137 S. Ct. at 1857 (collecting cases). Our conclusion here is no different.

III.

So what happens next? Just because a *Bivens* remedy is off the table does not mean the plaintiffs' cases are over. If the district court determines on remand that Weyker was acting under color of *state* law, their section 1983 claims may proceed,

-11-

subject to Weyker's defense of qualified immunity.[3]  *Farah*, 926 F.3d at 502–03, 503 n.1 (declining "to skip over the under-color-of-state-law element to decide . . . qualified immunity"); *see Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014) (evaluating whether an officer acted under color of state law).

## IV.

We accordingly vacate and remand to the district court to dismiss the plaintiffs' *Bivens* claims and determine whether their cases can proceed under 42 U.S.C. § 1983.

KELLY, Circuit Judge, dissenting.

In Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), the Supreme Court cautioned that extending Bivens to new contexts is a "disfavored judicial activity."  Id. at 1857 (cleaned up).  But because I believe that one of plaintiffs' claims does not extend Bivens to a new context, I respectfully dissent from the court's conclusion otherwise.[4]

In 2017, plaintiffs Hawo Ahmed and Hamdi Mohamud filed complaints against Officer Heather Weyker in federal court.  The complaints identify two

---

[3]It is premature at this point to address Weyker's argument that the district court abused its discretion when, in addressing qualified immunity, it declined to take judicial notice of matters outside the pleadings. *See Cravens v. Smith*, 610 F.3d 1019, 1029 (8th Cir. 2010) (standard of review); 2 James Wm. Moore, *Moore's Federal Practice* § 12.34[2], at 12-94 (3d ed. 2020).

[4]As an initial matter, I note that it may be premature to address Officer Weyker's claim that Bivens does not afford a potential remedy for plaintiffs' claimed injuries.  Officer Weyker appeals the district court's denial of her motion to dismiss the case based on qualified immunity.  But that opinion concluded that there was "no need to decide" at that time whether Bivens or 42 U.S.C. § 1983 provided the "proper vehicle" for plaintiffs' claims, and we "ordinarily, we do not decide issues the district

-12-

separate instances in which Officer Weyker allegedly lied about Ahmed and Mohamud's suspected criminal activity, leading to their detention in federal custody. First, Ahmed and Mohamud claim that Officer Weyker knowingly provided false information to Officer Anthijuan Beeks, which caused Officer Beeks to arrest and transport them to jail when he otherwise had no basis to do so. Second, they claim that, after this initial arrest, Officer Weyker submitted a federal criminal complaint and supporting affidavit, in which she omitted exculpatory information and included information that she knew to be false. This affidavit led the court to issue arrest warrants for Ahmed and Mohamud. They were then placed in federal custody and eventually indicted for violating multiple federal laws. In both of these actions, Ahmed and Mohamud contend, Officer Weyker fabricated "probable cause that did not otherwise exist," causing them to be "seized, arrested, detained, charged and indicted" in violation of their Fourth Amendment rights.

I agree with the court that, based on our precedent, no <u>Bivens</u> remedy is available for plaintiffs' claim that Officer Weyker violated their Fourth Amendment rights by submitting a false affidavit to the district court. In <u>Farah v. Weyker</u>, 926 F.3d 492 (8th Cir. 2019), this court held that a claim that a federally deputized officer (namely, Officer Weyker) "duped prosecutors and a grand jury into believing that the plaintiffs were part of a multi-state sex-trafficking conspiracy" was "meaningfully different" from established <u>Bivens</u> cases. <u>Id.</u> at 498. Because "special factors" weighed against extending <u>Bivens</u> to the new context, we declined to do so. <u>Id.</u> at 500-02. As largely the same differences and special factors are present in Ahmed and Mohamud's second allegation against Officer Weyker, <u>Farah</u> forecloses the possibility of <u>Bivens</u> relief on that claim.

But <u>Farah</u> does not foreclose relief for Ahmed and Mohamud's first allegation—that Officer Weyker lied to Officer Beeks, which resulted in their

---

court did not adjudicate." <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 603 (8th Cir. 2009) (quoting <u>Daisy Mfg. Co. v. NCR Corp.</u>, 29 F.3d 389, 395 (8th Cir. 1994)).

unlawful arrest.[5]  As Ahmed and Mohamud describe it in their complaints, this claim asserts that Officer Weyker caused them to be arrested without probable cause.  See United States v. Thompson, 533 F.3d 964, 969-70 (8th Cir. 2008) (explaining that the question of whether officers have probable cause to arrest is based on the collective knowledge of all officers involved).  This was the claim at issue in Bivens.  Though Bivens also alleged that officers used unreasonable force during their search of his home, one of his core contentions was that the officers did not have probable cause when they arrested him.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971) ("[Bivens's] complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly read, it alleges as well that the arrest was made without probable cause.").  Rather than representing an extension of Bivens, plaintiffs' claim falls squarely within the cause of action recognized by Bivens itself.  Cf. Abbasi, 137 S. Ct. at 1856 (refusing to "cast doubt on the continued force, or even the necessity, of Bivens in the search-and-seizure context in which it arose"); see also Hicks v. Ferreya, 965 F.3d 302, 311-12 (4th Cir. 2020) (applying Bivens to a claim of unlawful seizure during a traffic stop); Jacobs v. Alam, 915 F.3d 1028, 1038-39 (6th Cir. 2019) (applying Bivens to claims for excessive force, false arrest, malicious prosecution, fabrication of evidence, and civil conspiracy); Brunoehler v. Tarwater, 743 F. Appx. 740, 743-44 (9th Cir. 2018) (unpublished) (applying Bivens to claims of search and arrest without probable cause).

In concluding that plaintiffs' claim presents a new context, the court highlights several differences between plaintiffs' claim and Bivens that it finds relevant: differences between the "sorts of actions being challenged," "the mechanism of injury" and role of Officer Weyker in that injury, and the type of showing required to prove plaintiffs' claim.  See supra at 7-8.  To the court, these

_____

[5]The court describes prosecutors as "play[ing] a role" in the events underlying Ahmed and Weyker's claim.  Supra at 8.  On my read, the only legal actors involved in the arrest were Officer Weyker and Officer Beeks.

-14-

differences require it to move on to step two of <u>Abbasi</u> and determine whether "special factors" exist that would counsel hesitation in extending a <u>Bivens</u> remedy.

I do not see the differences that the court does. As to the first claimed difference, the type of action being challenged here was also at issue in <u>Bivens</u>: an arrest unsupported by probable cause. That <u>Bivens</u> also included a separate claim about the officers' use of force within Bivens's home does not undermine the fact that in both that case and this one the plaintiffs' claimed injuries stemmed from the arrest itself. Similarly, the mechanism of injury and role Officer Weyker played are the same as in <u>Bivens</u>: actions by law enforcement officers, one of whom was Officer Weyker. The court points to the absence of a "direct causal chain" and the involvement of "multiple independent legal actors" in this case, <u>see supra</u> at 7, but the situation is simpler than the court makes it out to be. Officer Weyker is alleged to have lied to Officer Beeks about the basis for probable cause to arrest plaintiffs, and Officer Beeks arrested plaintiffs based on that false information. It is unclear to me why we should take pains to separate out Officer Weyker's role in plaintiffs' arrest, particularly when in other contexts we readily recognize the collective role different officers play in effectuating arrests. <u>See, e.g.</u>, <u>Thompson</u>, 533 F.3d at 969-70 (describing the collective knowledge doctrine). Finally, the showing required to prove plaintiffs' claim here would be the same as that required in <u>Bivens</u>. In any challenge to a warrantless arrest, the person claiming a violation of her Fourth Amendment rights must show that the facts known to the officers involved did not provide a reasonable probability of criminal activity. <u>See, e.g.</u>, <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 586 (2018) (explaining probable cause standard). Regardless of why a plaintiff might allege that probable cause was lacking, the court assessing her claim must examine what the officers knew at the time of the arrest—an inquiry that may, in any case, involve "fact-checking" of how those officers came to their conclusions.[6] <u>Cf.</u> <u>Fisher v. Wal-Mart Stores, Inc.</u>, 619 F.3d 811, 817 (8th

---

[6]<u>Williams v. City of Alexander</u>, 772 F.3d 1307 (8th Cir. 2014), which addresses an allegedly false warrant affidavit, may support the conclusion that plaintiffs' false affidavit claim is different than that in <u>Bivens</u>. <u>See id.</u> at 1311 ("[W]hen a police officer deliberately or recklessly makes false statements to

-15-

Cir. 2010) (when one officer instructs another to make an arrest, "[w]e consider the pertinent question to be whether [the instructing officer] had probable cause at the time of the arrest: that is, whether the facts and circumstances would have led to a reasonable conclusion that a crime had been committed"). This is the showing that the plaintiff in Bivens would have had to make and that Ahmed and Mohamud would be making here.

We are also guided by Abbasi, which provides examples of "differences that are meaningful enough to make a given context a new one." Abbasi, 137 S. Ct. at 1859-60. These include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence or potential special factors that previous Bivens cases did not consider." Id. at 1860. No meaningful differences are present here. Like the agents in Bivens, Officer Weyker was an investigative officer who is alleged to have violated plaintiffs' Fourth Amendment right to be free of unlawful arrest. Cf. Hernandez v. Mesa, 140 S. Ct. 735, 743-44 (2020) (establishing that "[a] claim may arise in a new context even if it is based on the same constitutional provision" as a previous claim, but describing Bivens as covering "an allegedly unconstitutional arrest and search" by local police officers). The judicial guidance on conducting a lawful arrest remains clear, and the mandate comes from the Constitution. Recognizing plaintiffs' claim risks no more intrusion into the functioning of another branch of government than did Bivens, which also turned on the knowledge and actions of police officers. And here, plaintiffs challenge an "individual instance[] . . . of law enforcement overreach, which due to [its] very nature [is] difficult to address except by way of damages actions after the fact." Abbasi, 137 S. Ct. at 1862.

---

demonstrate probable cause for an arrest warrant, the warrant may be invalidated under Franks v. Delaware."). But in my view, Franks plays no role in a claim that officers effectuated a warrantless arrest without probable cause.

While these factors are not exhaustive, see id. at 1859-60, each supports the conclusion that the context for plaintiffs' false arrest claim is not new.

The Supreme Court in Abbasi did "not intend[] to cast doubt on the continued force, or even the necessity, of Bivens in the search-and-seizure context in which it arose." Id. at 1856; see also id. at 1856-57 ("Bivens does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward."). I find no meaningful difference between plaintiffs' Fourth Amendment false arrest claim and what the Supreme Court recognized in Bivens and has continued to recognize in Abbasi and Hernandez. In my view, a Bivens remedy is available to Ahmed and Mohamud on this claim.[7] Because the court denies them this remedy, I respectfully dissent.

—————————————————————

[7]The court maintains that Ahmed and Mohamud may still seek recourse for their claimed harm under § 1983. However, I note that the district court has already determined in a related case that, on the date in question, Officer Weyker was acting as a federally deputized officer, not under color of state law, making a § 1983 claim unavailable. See Yassin v. Weyker, No. 16-cv-2580 (JNE/TNL), 2020 WL 6438892 at *4-5 (D. Minn. Sept. 30, 2020), appeal filed, No. 20-3299 (8th Cir. Nov. 2, 2020). The court's decision here will thus have the likely effect of denying plaintiffs any legal remedy for the constitutional violation they allege. See Abbasi, 137 S. Ct. at 1863 ("There is a persisting concern, of course, that absent a Bivens remedy there will be insufficient deterrence to prevent officers from violating the Constitution.").