**PUBLISHED**

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**No. 19-2285**

REDDY VIJAY ANNAPPAREDDY,

Plaintiff – Appellee,

v.

CATHERINE SCHUSTER PASCALE,

Defendant – Appellant,

and

MAURA LATING; ROBERT MOSLEY; PAM ARNOLD; JAMES P. RYAN; SANDRA WILKINSON; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

Defendants.

**No. 19-2337**

REDDY VIJAY ANNAPPAREDDY,

Plaintiff – Appellant,

v.

MAURA LATING; ROBERT MOSLEY; JAMES P. RYAN; SANDRA WILKINSON; STEVEN CAPOBIANCO,

Defendants – Appellees,

and

CATHERINE SCHUSTER PASCALE; PAM ARNOLD; UNITED STATES OF AMERICA,

        Defendants.

_____

**No. 19-2344**
_____

REDDY VIJAY ANNAPPAREDDY,

        Plaintiff – Appellee,

        v.

MAURA LATING,

        Defendant – Appellant,

        and

CATHERINE SCHUSTER PASCALE; ROBERT MOSLEY; PAM ARNOLD; JAMES P. RYAN; SANDRA WILKINSON; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

        Defendants.

_____

**No. 19-2351**
_____

REDDY VIJAY ANNAPPAREDDY,

        Plaintiff – Appellee,

        v.

JAMES P. RYAN,

        Defendant – Appellant,

and

CATHERINE SCHUSTER PASCALE; MAURA LATING; ROBERT MOSLEY; PAM ARNOLD; SANDRA WILKINSON; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

Defendants.

**No. 19-2352**

REDDY VIJAY ANNAPPAREDDY,

Plaintiff – Appellee,

v.

STEVEN CAPOBIANCO,

Defendant – Appellant,

and

CATHERINE SCHUSTER PASCALE; MAURA LATING; ROBERT MOSLEY; PAM ARNOLD; JAMES P. RYAN; SANDRA WILKINSON; UNITED STATES OF AMERICA,

Defendants.

**No. 19-2369**

REDDY VIJAY ANNAPPAREDDY,

Plaintiff – Appellee,

v.

ROBERT MOSLEY,

Defendant – Appellant,

3

and

CATHERINE SCHUSTER PASCALE; MAURA LATING; PAM ARNOLD; JAMES P. RYAN; SANDRA WILKINSON; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

Defendants.

---

**No. 19-2370**

---

REDDY VIJAY ANNAPPAREDDY,

Plaintiff – Appellee,

v.

SANDRA WILKINSON,

Defendant – Appellant,

and

CATHERINE SCHUSTER PASCALE; MAURA LATING; ROBERT MOSLEY; PAM ARNOLD; JAMES P. RYAN; STEVEN CAPOBIANCO; UNITED STATES OF AMERICA,

Defendants.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. Joseph F. Anderson, Jr., Senior District Judge.  (1:18-cv-03012-JFA)

---

Argued:  January 25, 2021                    Decided:  April 26, 2021

---

Before GREGORY, Chief Judge, and MOTZ and HARRIS, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

———————————

**ARGUED:** Joshua D. Greenberg, JOSH GREENBERG LAW FIRM, Washington, D.C., for Plaintiff-Appellee/Cross-Appellant Reddy Vijay Annappareddy. Steven M. Klepper, KRAMON & GRAHAM, P.A., Baltimore, Maryland; Brian Frey, ALSTON & BIRD, LLP, Washington, D.C.; Jodie Buchman, SILVERMAN | THOMPSON | SLUTKIN | WHITE LLC, Baltimore, Maryland; Wesley Wintermyer, CADWALADER, WICKERSHAM & TAFT LLP, Washington, D.C., for Defendants-Appellees/Cross-Appellants. **ON BRIEF:** Stuart M. Paynter, PAYNTER LAW FIRM PLLC, Washington, D.C., for Plaintiff-Appellee/Cross-Appellant. John A. Bourgeois, Geoffrey H. Genth, William J. Harrington, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellant Catherine Pascale. Andrew C. White, Christopher J. Macchiaroli, SILVERMAN | THOMPSON | SLUTKIN | WHITE LLC, Baltimore, Maryland, for Appellee/Cross-Appellant Maura Lating. Brent J. Gurney, Kelly P. Dunbar, Edward Williams, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellee/Cross-Appellant Steven Capobianco. Thomas H. Barnard, Kelly M. Preteroti, Christopher C. Dahl, BAKER, DONELSON, BEARMAN, CALDWELL BERKOWITZ, PC, Baltimore, Maryland, for Appellee/Cross-Appellant James P. Ryan. Edward T. Kang, Brandon Springer, ALSTON & BIRD, LLP, Washington, D.C., for Appellee/Cross-Appellant Sandra Wilkinson. Douglas Gansler, William Simpson, CADWALADER, WICKERSHAM & TAFT LLP, Washington, D.C., for Appellee/Cross-Appellant Robert Mosley.

———————————

PAMELA HARRIS, Circuit Judge:

Reddy Vijay Annappareddy was the owner of a chain of pharmacies in Maryland and nearby states when he was prosecuted for Medicaid fraud. A district court ultimately dismissed the charges against him, finding that the government had used flawed analyses of the pharmacies' inventory and billing practices to convict Annappareddy at trial, and then destroyed relevant evidence while a motion for retrial was pending.

After the case against him was dismissed, Annappareddy filed a wide-ranging complaint in federal court, seeking compensatory and punitive damages from multiple defendants. According to Annappareddy, state and federal investigators and prosecutors, working together, violated his rights under the federal Constitution and Maryland law, fabricating evidence against him and then destroying exculpatory evidence when it seemed their malfeasance might come to light. For the complaint's federal constitutional claims against individual officers, Annappareddy relied on a *Bivens* cause of action. He also sought relief against individual state officers under § 1983 and Maryland state law, and against the United States under the Federal Tort Claims Act.

At issue in these appeals are two preliminary rulings by the district court. First, the court dismissed Annappareddy's federal constitutional claims, ruling that they would constitute impermissible extensions of the *Bivens* cause of action. But the court allowed several state-law claims to proceed against one of the prosecutors in charge of Annappareddy's criminal case, Catherine Pascale, rejecting her argument that absolute prosecutorial immunity shielded her from allegations that she had fabricated inculpatory evidence and destroyed exculpatory evidence.

6

The parties appealed both determinations. On review, we affirm the district court's dismissal of the federal constitutional claims. Like the district court, we conclude that these claims would extend the *Bivens* remedy into a new context, and that special factors counsel against an extension to cover intertwined allegations of wrongdoing by prosecutors and criminal investigators in Annappareddy's prosecution. We disagree, however, with the district court's determination that the state-law claims can move forward against Pascale, finding instead that absolute prosecutorial immunity bars the claims against her. Accordingly, we affirm in part and reverse in part, and remand for further proceedings.

## I.

## A.

Because we review this case at the motion-to-dismiss stage, we draw the following facts from the complaint, accepting them as true for the purposes of this appeal. *See Nero v. Mosby*, 890 F.3d 106, 114 (4th Cir. 2018).

### 1.

We begin with the investigation and indictment of Reddy Vijay Annappareddy. We focus here on several investigators who would become defendants in Annappareddy's suit, accused of fabricating evidence against him and submitting a false affidavit to obtain a search warrant.

Annappareddy is the founder and owner of Pharmacare, a now-shuttered chain of pharmacies that once had nine locations in several states. In 2012, Maryland's Medicaid Fraud Control Unit ("MFCU") began investigating Pharmacare's billing practices after a

7

former employee accused the company of billing government health care programs for prescriptions that were never delivered. MFCU investigators soon began working with a pharmacist at one of Pharmacare's stores, Lisa Ridolfi, to gather evidence. Annappareddy alleges that Ridolfi, in the hopes of receiving payment as a "whistleblower," began fabricating evidence of fraud. According to Annappareddy, Ridolfi's main contact at the MFCU, investigator Pam Arnold, was aware of and encouraged these fabrications, and passed the false information to prosecutors "as if it were accurate and reliable."

At some point in 2013, federal law enforcement joined the investigation, and began building a case that Annappareddy was submitting claims for prescriptions for high-dollar medications that were never filled or received by patients. Maura Lating, a special agent for the Federal Bureau of Investigation ("FBI"), took over leadership of the team of investigators. Also on the team was Robert Mosley, a special agent in the Office of Inspector General of the U.S. Department of Health & Human Services ("HHS").

Mosley worked with a Medicare drug integrity contractor ("MEDIC") to prepare what would turn out to be a critical analysis of Pharmacare's invoices and inventory. That MEDIC analysis purported to find "shortages" of dozens of medications – that is, that Pharmacare had insufficient inventory to fill prescriptions for which it billed and was paid. Annappareddy alleges that Mosley "rig[ged]" those findings, so that they failed to account for legal transfers between Pharmacare locations and ignored significant inventory of the medications in question. J.A. 113. And then, according to Annappareddy, investigators used this falsified analysis as evidence to obtain both a search warrant against Pharmacare and a criminal indictment against him.

On July 23, 2013, a magistrate judge issued sealed warrants to search six Pharmacare locations. To secure those warrants, Lating – the FBI agent now leading the investigation – submitted an affidavit (the "Lating Affidavit") that, Annappareddy claims, purported to establish probable cause through "material false statements and omissions." J.A. 114. Most important, the Lating Affidavit included the MEDIC "invoice review" described above, which falsely showed that Pharmacare had medication shortages that in fact did not exist. Other claimed flaws in the Lating Affidavit included misstatements of the law governing prescription billing and information provided by untrustworthy informants. Annappareddy alleges that Lating had "actual knowledge" of these fabrications and falsehoods, and "acted at least recklessly in making" them. J.A. 116. And without this flawed evidence, he contends, the Lating Affidavit would not have established probable cause, and the magistrate judge would not have issued the warrants.

The same day that investigators secured the search warrants, a grand jury charged Annappareddy and two Pharmacare pharmacy technicians with health care fraud and aggravated identity theft. Annappareddy alleges that this indictment, like the search warrants, was secured by evidence Lating, Mosley, and Arnold knew to be false.

Two days later, on July 25, 2013, federal and state agents raided six Pharmacare locations and executed the search warrants. Because the agents seized computers, servers, and other material crucial to operations, the raid shut Pharmacare down for good. Four days after that, law enforcement arrested Annappareddy. He was released pending trial, subject to restrictions on his movement.

2.

We turn now to the post-indictment and trial stage of the case, which introduces the two prosecutors who also would become defendants in this action. Here, the gist of Annappareddy's claim is that investigators and prosecutors used false evidence to obtain a superseding indictment and then a conviction against him.

After the original indictment, responsibility for the case was turned over to prosecutors Sandra Wilkinson, an Assistant U.S. Attorney, and Catherine Pascale, an Assistant Attorney General in the MFCU who appeared in the federal criminal case as a Special Assistant U.S. Attorney. According to the complaint, at the time of the original indictment, Wilkinson and Pascale did not know about the alleged falsehoods and fabrications that had been presented to the grand jury – and in fact had been misled by investigators about problems with the underlying evidence.

By late 2013, however, other members of the investigative team were aware of problems with the invoice analyses and were actively working to produce new – and equally misleading – evidence against Annappareddy. According to the complaint, Steven Capobianco, an investigator in the U.S. Attorney's Office, began working with MEDIC to produce new analyses of Pharmacare's inventory. Capobianco, along with the other investigator defendants, ultimately provided an updated analysis replicating the original false data on inventory "shortages" and government "losses," despite knowing that the failure to account for transfers between Pharmacare locations rendered it erroneous. That analysis, along with other purportedly fabricated evidence, then was used by prosecutors to secure a superseding indictment against Annappareddy on March 11, 2014. Again, the complaint alleges that the two prosecutors – Wilkinson and Pascale – were "misled and

10

misinformed" by investigators in the lead-up to the superseding indictment, and "did not know or have reason to suspect until long after [it] was filed that material false evidence was presented to that grand jury." J.A. 153.

But at some later point, Annappareddy claims, Wilkinson and Pascale did learn of the problems with the evidence in their case. Rather than reveal them to the defense team or otherwise correct them, Wilkinson and Pascale continued to seek out new analyses of Pharmacare's inventory that could support a conviction at trial. The prosecutors worked with an internal auditor at the U.S. Attorney's Office to produce new "shortage" and "loss" calculations that would – again falsely – inculpate Annappareddy in fraud. J.A. 157, 159.

As a result of the presentation of this and other false evidence, a jury in the District of Maryland convicted Annappareddy on two of the three counts in the superseding indictment on December 15, 2014. Annappareddy remained on release pending sentencing, subject to home detention. The government asked the district court to sentence Annappareddy to 12 years in prison, followed by deportation.

3.

Finally, we turn to the post-trial period, and to Annappareddy's allegations of evidence destruction. After his conviction and now represented by new counsel, Annappareddy moved for a new trial. Discovery on that motion soon uncovered evidence of flaws in the inventory calculations prosecutors had used at trial. That flawed analysis had been key to establishing the existence of purported shortages of medications for which Pharmacare had billed various government insurance programs, as well as the government's resulting losses. As a result of these disclosures, the government joined

11

Annappareddy's request for a new trial, and the district court granted it in June 2016. That summer, the prosecutors secured a second superseding indictment.

As the parties prepared to litigate those new charges, the government disclosed that while the motion for a new trial was pending, it had destroyed three boxes of documents containing the only copies of Pharmacare medication and signature logs – documents that Annappareddy now claims could have confirmed that Pharmacare actually filled and delivered the prescriptions for which it had billed. According to Annappareddy, though he had access to those documents during pre-trial discovery, he did not understand their exculpatory nature until later. And in March 2015, prosecutors Wilkinson and Pascale, and investigators Mosley, Arnold, and Ryan, met at the U.S. Attorney's Office and decided to destroy this material. Wilkinson later claimed that the destruction was "part of a general cleanup of boxes of paper." J.A. 165. Annappareddy alleges that it was, instead, a "selective" and "intentional" act. J.A. 164.

Citing the prosecutors' and investigators' alleged malfeasance, Annappareddy moved to dismiss with prejudice the charges in the second superseding indictment. The district court granted that request, finding that the government had violated Annappareddy's due process rights by presenting erroneous inventory and loss calculations at his first trial without disclosing the potential for error to the defense. The district court also was "troubled" by the government's unilateral destruction of several boxes of

12

documents while the motion for a new trial was pending. J.A. 174.[1] After the district court's order of dismissal, the government initially appealed, but then changed course and withdrew its appeal. In March 2017, the court dismissed the charges in the original indictment, ending the criminal case against Annappareddy.

**B.**

On October 1, 2018, Annappareddy filed suit in the District of Maryland against the investigators and prosecutors in his criminal case, naming a total of seven individual defendants.[2] Only some of the 25 counts in the 111-page amended complaint, filed on May 1, 2019, are at issue on appeal.[3]

First are several federal constitutional claims, all brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against the federal defendants in their individual capacities. The claims brought solely against federal

---

[1] We take this description of the district court's decision – like the rest of our factual recitation – from Annappareddy's complaint. But we note that Annappareddy's account is consistent with the record of the court's oral ruling of September 1, 2016. The government defendants emphasize a different portion of the ruling, in which the court found that there remained other evidence of fraud. *See* J.A. 86. But there is no dispute as to the substance of the district court's decision.

[2] All judges in the district recused themselves, and the Fourth Circuit assigned Judge Joseph F. Anderson, Jr., of the District of South Carolina to hear the case.

[3] As referenced above, the operative complaint includes twenty claims against individual federal and state officers – brought under some combination of *Bivens*, 42 U.S.C. § 1983, and Maryland state law – as well as five Federal Tort Claims Act ("FTCA") claims against the United States. Several claims against Arnold, a Maryland state investigator, as well as the FTCA claims against the United States, remain pending in the district court and are not at issue in this appeal.

investigators can be boiled down to three basic theories of liability: that they violated the Fourth Amendment under *Franks v. Delaware*, 438 U.S. 154 (1978), by knowingly submitting false information – primarily, MEDIC's false inventory analysis – to secure the Pharmacare search warrants; that they again violated the Fourth Amendment by using similar false evidence to secure the original indictment and arrest warrant; and that they violated the Fifth Amendment's Due Process Clause by fabricating a new version of that false evidence to obtain a superseding indictment and conviction. One additional *Bivens* claim ropes in the prosecutors, as well, alleging that both the investigators and prosecutors violated the Due Process Clause by intentionally destroying exculpatory documents after Annappareddy's trial.

Also at issue are several state-law claims against Pascale, the state prosecutor, for her alleged fabrication and destruction of evidence. Annappareddy claims that Pascale intentionally inflicted emotional distress on him, violated his rights to procedural and substantive due process under Article 24 of the Maryland Constitution's Declaration of Rights, and participated in a civil conspiracy to violate his rights.

On October 18, 2019, the district court issued a lengthy written order addressing several motions to dismiss filed by the individual defendants, making two determinations at issue on appeal.

First, the district court dismissed Annappareddy's *Bivens* claims.[4] To "determin[e] whether to allow a claim asserted under *Bivens* to proceed," the court applied the "two-step framework" from *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), inquiring first whether the claims presented a new *Bivens* context; and then, if so, whether special factors counseled hesitation in extending a judicial remedy. J.A. 523–24 (citing *Tun-Cos v. Perrotte*, 922 F.3d 514, 522–23 (4th Cir. 2019)). In conducting that analysis, the court found especially helpful a recent Eighth Circuit decision, *Farah v. Weyker*, 926 F.3d 492 (2019), holding that similar claims of fabrication of evidence by law enforcement agents could not proceed under *Bivens*.

Applying the first step of the *Abbasi* framework, the district court concluded that the *Bivens* claims all arose in new contexts. Several counts, it noted, asserted rights not recognized in past *Bivens* cases – including those arising under the Fifth Amendment's Due Process Clause, and the right to be free from malicious prosecution under the Fourth Amendment. Others, the court explained, would extend *Bivens* to a new group of defendants – federal prosecutors. And even the more standard Fourth Amendment search claims against non-prosecutor defendants, the court reasoned, involved searches – performed with a warrant on commercial pharmacies – and conduct – "information-gathering and case-building" – very different from the warrantless detention and search of a person at issue in *Bivens*. J.A. 528 (citing *Farah*, 926 F.3d at 499). More generally, the

---

[4] We here consider only the *Bivens* claims that Annappareddy has continued to press on appeal.

15

court finished, "[p]robing the causal chain" in this case, unlike in *Bivens*, would implicate the judgments of "numerous decisionmakers, including federal investigators, prosecutors, and the grand jury," presenting a greater risk of interference with other branches of government.  J.A. 528–29 (quoting *Farah*, 926 F.3d at 499).

The court then considered the second step of *Abbasi* and held that special factors counseled hesitation in extending *Bivens*.  The interconnected allegations of widespread malfeasance in Annappareddy's complaint, the court explained, not only differentiated the case from *Bivens*, but also counseled against extending the *Bivens* remedy:  Evaluating those claims would "cause a deep and wide-ranging dive into all actions taken by each actor as well as all evidence available to investigators, prosecutors, judges, and juries (both trial and grand jury)," which could intrude into the executive branch's authority to enforce the law and "impact government operations systemwide."  J.A. 530.  The court also determined that the existing, limited remedial structure Congress had crafted for criminal defendants subject to government misconduct counseled against creating an implied *Bivens* action.  "[T]he fact that Congress has expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice."  J.A. 532 (quoting *Farah*, 926 F.3d at 502).

Second, the district court determined that Pascale – the state prosecutor – was not entitled to absolute immunity from the remaining claims against her, which arose under state law.  As the district court explained, courts determine whether a prosecutor is protected by absolute immunity using a functional approach, asking whether a given act is "intimately associated with the judicial phase of the criminal process."  J.A. 535 (quoting

16

*Nero*, 890 F.3d at 117); *see also* J.A. 537 (citing *Gill v. Ripley*, 724 A.2d 88 (Md. 1999)).

Applying that approach, the district court concluded that neither factual predicate for the claims against Pascale – that she destroyed exculpatory evidence or that she fabricated inculpatory evidence – was intimately associated with the judicial phase of a prosecution.

Specifically, as to destruction, the court concluded that the decision to throw out documents, in this context, was purely "administrative": As the court read the complaint, the evidence was destroyed "as part of a general cleanup" undertaken because of limited storage. J.A. 535–36. As to fabrication, the court reasoned that "join[ing] in a conspiracy to fabricate evidence" was not a prosecutorial act, and more resembled the conduct of an investigator in the "pre-prosecutorial investigative" stage of a criminal case. J.A. 536–37 (citing *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997)).[5]

## II.

We consider two consolidated appeals arising out of these complex district court proceedings. First, Annappareddy has appealed the dismissal of his *Bivens* claims.[6] We

---

[5] Pascale moved for reconsideration of the denial of immunity, which the court denied.

[6] Before the district court, all the *Bivens* defendants argued that even assuming a *Bivens* cause of action, they were entitled to absolute or qualified immunity. In "the interest of judicial economy," the district court also considered and rejected those immunity claims. J.A. 534. The defendants again press their immunity arguments on appeal, now as an alternative ground for affirmance. Because we affirm the district court's dismissal of the *Bivens* claims under *Abbasi*, we need not reach those contentions.

have jurisdiction over that appeal because the district court entered final judgments in favor of the relevant defendants under Federal Rule of Civil Procedure 54(b). *See Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993).[7] In addition, Pascale has appealed the district court's denial of prosecutorial immunity. We have jurisdiction over that appeal because denials of absolute immunity are immediately appealable under 28 U.S.C. § 1291 and the collateral order doctrine. *See Nero*, 890 F.3d at 117.

We review de novo both the district court's dismissal of the *Bivens* claims, *see Lebron v. Rumsfeld*, 670 F.3d 540, 547 (4th Cir. 2012), and the court's denial of absolute prosecutorial immunity, *see Nero*, 890 F.3d at 117. We conclude, like the district court, that the *Bivens* claims before us are impermissible extensions of this judicially crafted remedy into new contexts, and affirm the district court's dismissal of those claims. We disagree, however, with the district court on Pascale's entitlement to absolute prosecutorial immunity, and therefore reverse and remand with instructions to enter judgment in favor of Pascale on the remaining state-law claims against her.

## A.

We begin with Annappareddy's *Bivens* claims, and with the legal framework that governs them. In those claims, Annappareddy alleges that the federal investigators and prosecutors named as defendants violated his rights under the Fourth and Fifth

---

[7] Though the district court did not enter a final judgment as to Pascale, it certified its dismissal of the federal *Bivens* claims against her for interlocutory appeal under 28 U.S.C. § 1292, while allowing the state-law claims to proceed. J.A. 572. Annappareddy, however, has not sought to revive his *Bivens* claims against Pascale.

Amendments. The question before us is not whether those violations occurred; indeed, we are cognizant that the district court in Annappareddy's criminal case, without passing on these claims directly, concluded that significant government wrongdoing required the dismissal of the charges against him. The question is whether, assuming the constitutional violations exist, there is a cause of action that would allow Annappareddy to recover money damages from the individual federal defendants. *See Earle v. Shreves*, 990 F.3d 774, No. 19-6655, 2021 WL 896399, at *2 (4th Cir. Mar. 10, 2021) ("Whether an implied damage remedy is available for a constitutional claim is logically antecedent to any question about the merits of the claim." (internal quotation marks omitted)).

If Annappareddy were bringing these claims against *state* officials, then there would be no question that he could seek money damages under 42 U.S.C. § 1983. *See Tun-Cos*, 922 F.3d at 520. And indeed, as noted earlier, his § 1983 claim against state investigator Arnold remains pending before the district court. But no statute provides an analogous "cause of action against *federal* officials." *Id.* So if there is a remedy, then it must come in the form of the implied cause of action first recognized in *Bivens*, allowing suits "for damages against federal officers alleged to have violated a citizen's rights under the Constitution." *Earle*, 2021 WL 896399, at *2. In that case and then in two subsequent cases, the Supreme Court allowed plaintiffs alleging certain Fourth, Fifth, and Eighth Amendment violations to proceed under this implied cause of action. *See Bivens*, 403 U.S. at 396–97 (finding remedy for Fourth Amendment violation related to use of unreasonable force during warrantless search and seizure); *Davis v. Passman*, 442 U.S. 228, 248–49 (1979) (same for violation of equal protection component of Fifth Amendment Due Process

19

Clause); *Carlson v. Green*, 446 U.S. 14, 17–19 (1980) (same for violation of Eighth Amendment Cruel and Unusual Punishments Clause).

In the years since those cases were decided, however, "the Supreme Court's approach to implied damage remedies has changed dramatically, to the point that 'expanding the *Bivens* remedy is now a disfavored judicial activity.'" *Earle*, 2021 WL 896399, at *2 (quoting *Abbasi*, 137 S. Ct. at 1857). Indeed, the Court has "gone so far as to observe that if 'the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that [it] would have reached the same result." *Hernandez v. Mesa*, 140 S. Ct. 735, 742–43 (2020) (quoting *Abbasi*, 137 S. Ct. at 1856). "And for almost 40 years, [the Court has] consistently rebuffed requests to add to the claims allowed under *Bivens*." *Id.* at 743 (gathering cases).

Consistent with that view, the *Abbasi* framework for determining whether a *Bivens* remedy is available "places significant obstacles in the path to recognition of an implied cause of action." *Earle*, 2021 WL 896399, at *3. First, the court must evaluate "whether a given case presents a 'new *Bivens* context.'" *Tun-Cos*, 922 F.3d at 522. To present a new context, "a radical difference is not required." *Id.* at 523. The Court has set out a non-exhaustive list of potentially meaningful differences, "some of which are quite minor":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* (quoting *Abbasi*, 137 S. Ct. at 1860). "If the context is *not* new . . . then a *Bivens* remedy continues to be available." *Id.* at 522–23. But if the context *is* new, courts must move on to the second step of the *Bivens* analysis: "evaluat[ing] whether there are 'special factors *counselling hesitation* in the absence of affirmative action by Congress.'" *Id.* at 523 (quoting *Abbasi*, 137 S. Ct. at 1857). If such special factors are present, "a *Bivens* action is not available." *Id.* [8]

We have not yet applied the *Abbasi* standard to a factual context like the one presented here – where investigators and prosecutors allegedly participated together in a long-running scheme to fabricate and destroy evidence during a criminal investigation and prosecution. But as the district court noted, the Eighth Circuit has, in a set of appeals arising out of claims by several plaintiffs that a police officer, acting as a deputized U.S. Marshal, had exaggerated and invented facts and hidden exonerating evidence in order to implicate them in an alleged sex-trafficking operation. *See Farah*, 926 F.3d at 496–97; *Ahmed v. Weyker*, 984 F.3d 564, 566 (2020). In each case, that court held that *Bivens* could not be extended, under the *Abbasi* framework, to imply a cause of action to remedy the plaintiffs' wrongful arrests and prosecutions. Whether or not it would be sound policy to provide such a remedy, the court concluded, it would have to come from Congress, and not the courts. *See Farah*, 926 F.3d at 502.

---

[8] Annappareddy suggests that we do not need to engage in this two-part test because *Abbasi* "reaffirm[ed]" the continuing availability of *Bivens* claims that, like his, arise in the "common and recurrent" sphere of law enforcement operations. But we have already held that *Abbasi* is "the framework that now *must* be applied in determining whether a *Bivens* remedy is available against federal officials." *Tun-Cos*, 922 F.3d at 522 (emphasis added).

## 1.

Against this backdrop, we turn now to the claims at issue in this case, starting with Annappareddy's two claims under the Fifth Amendment's Due Process Clause: that federal investigators violated his due process rights by fabricating evidence to secure the superseding indictment, and that federal investigators and prosecutors deprived him of due process by deliberately destroying exculpatory evidence. Although Annappareddy has preserved these claims on appeal, he does not focus on them; at oral argument, he conceded that they are the weaker of his *Bivens* claims. We agree with that assessment and may dispense briefly with them here.

Under *Abbasi*'s first step, these claims clearly present a new *Bivens* context. As the district court correctly recognized, *Bivens* has never "been extended to a Fifth Amendment due process claim." J.A. 525; *see Abbasi*, 137 S. Ct. at 1860 (listing "the constitutional right at issue" as potential meaningful difference). Although the Supreme Court did recognize a *Bivens* cause of action in a Fifth Amendment equal protection case arising from alleged sex discrimination in federal employment, *Davis*, 442 U.S. at 248–49, the fabrication and destruction of evidence claims here "are far afield from the sex[] discrimination context presented" in *Davis*, J.A. 526. And beyond the different right at issue, one of Annappareddy's Fifth Amendment claims also seeks to hold accountable a new set of defendants – federal prosecutors. *See Abbasi*, 137 S. Ct. at 1857 (naming "new category of defendants" as potential meaningful difference). By itself, these distinctions are enough to establish that we are in a new context for *Bivens* purposes.

We also have little difficulty concluding that special factors counsel hesitation in extending the *Bivens* cause of action to this new constitutional right and class of defendants. Proving claims like these – the falsification and destruction of evidence by prosecutors as well as investigators, in connection with a criminal prosecution – would "invite a wide-ranging inquiry into the evidence available to investigators, prosecutors, and the grand jury," *Farah*, 926 F.3d at 500, and could require a jury to determine "what [officers] knew, what [they] did not know, and [their] state of mind at the time," *Ahmed*, 984 F.3d at 570. All of these "after-the-fact inquiries" pose the kind of "risk of intrusion on executive-branch authority to enforce the law and prosecute crimes" that counsels against implying a cause of action for damages. *Farah*, 926 F.3d at 501.

2.

The focus of Annappareddy's appeal is his Fourth Amendment claims against the federal investigators – Lating and Mosley – who were responsible for securing search warrants against his pharmacies and an arrest warrant and indictment against him. According to Annappareddy, those investigators violated the Fourth Amendment in two respects: first by falsifying the affidavit submitted to obtain the search warrant (the "*Franks* claims"), and then by falsifying evidence in support of the arrest warrant and original indictment (the "false arrest claims"). On appeal, Annappareddy urges us to treat those claims separately, but we think they are not so easily disentangled. Annappareddy's own complaint recognizes the significant overlap in the alleged wrongdoing associated with each – including nearly identical calculations of "loss," and similar misstatements of the law governing prescription refills. Indeed, the search warrant against Pharmacare and

23

indictment charging Annappareddy were secured on the very same day. Nevertheless, we treat these claims separately to the extent possible and useful for our analysis. And as explained below, we find that no *Bivens* remedy is available for any of these factually intertwined Fourth Amendment claims.

a.

We start with whether Annappareddy's Fourth Amendment claims present a "new context" under *Abbasi*'s first step. The most analogous Supreme Court private-remedy case is *Bivens* itself, which recognized a cause of action against federal officers who violated the plaintiff's Fourth Amendment rights during a warrantless search and seizure. *See Bivens*, 403 U.S. at 389. And there are respects in which Annappareddy's claims resemble those raised in *Bivens*. For instance, as in *Bivens*, the plaintiff seeks to hold accountable only line-level investigative officers, not high-ranking officials. *See Abbasi*, 137 S. Ct. at 1860 (naming "rank of the officers involved" as example of possible meaningful difference). And in both cases, the officers sought to enforce only ordinary criminal laws. *See Tun-Cos*, 922 F.3d at 524 (contrasting immigration and criminal law-enforcement officers).

Nevertheless, we are persuaded that each of these Fourth Amendment claims in fact arises in a different context than the one recognized in *Bivens*. *See Ahmed*, 984 F.3d at 570 ("When one or more meaningful differences exist, it is not enough to identify a few similarities."). First, although *Bivens*, too, was a Fourth Amendment case, "[c]ourts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'" *Cantú v. Moody*, 933 F.3d 414, 422

24

(5th Cir. 2019). What *Bivens* involved was the Fourth Amendment right to be free of unreasonable *warrantless* searches and seizures; this case, by contrast, involves searches and a seizure conducted *with* a warrant. It thus implicates a distinct Fourth Amendment guarantee – that "no Warrants shall issue, but upon probable cause," *see* U.S. Const. amend. IV – governed by different legal standards. *See Cantú*, 933 F.3d at 423 ("'Judicial guidance' differs across the various kinds of Fourth Amendment violations."). Indeed, the Fourth Amendment sharply distinguishes between with-warrant and warrantless searches, treating the introduction of a warrant as a signal moment in the proceedings. *See United States v. Leon*, 468 U.S. 897, 913–14 (1984) (establishing "good faith" exception to exclusionary rule for with-warrant searches). For purposes of determining whether this is a "new" *Bivens* context, we think the "right at issue" here is meaningfully different from the one at issue in *Bivens* itself. *See Abbasi*, 137 S. Ct. at 1860 (listing "right at issue" as possible difference).[9]

Other factors distinguish this context, as well. For one thing, the "alleged misdeeds" here are "different from those in *Bivens*." *Farah*, 926 F.3d at 498. Speaking "to witnesses,

---

[9] We recognize that the Supreme Court in one case grappled with a *Bivens* claim arising out of a challenge to a search warrant. *See Groh v. Ramirez*, 540 U.S. 551, 555 (2004). But *Groh* involved an alleged facial defect in a warrant and required no inquiry into probable cause. *See id.* at 557. And more fundamentally, no party in *Groh* questioned the existence of a *Bivens* remedy, so the Court seemed only to assume – and was not called on to decide – that the plaintiffs should be able to proceed with that claim. *See id.* at 555. Similarly, in *Unus v. Kane*, 565 F.3d 103 (4th Cir. 2009), on which Annappareddy relies, we rejected a *Bivens* plaintiff's Fourth Amendment fabrication-of-evidence claim on other grounds, and so had no need to affirm that a *Bivens* cause of action was available. *See id.* at 123–25.

draft[ing] reports, and shar[ing] information with prosecutors and other investigators" are "information-gathering and case-building activities" that represent "a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Id.* at 499. As the district court put it, "[t]he Court in *Bivens* never contemplated" the kind of "extensive data gathering, analysis, examination, and coordination" at issue in this case. J.A. 527.

These differences are especially significant because they mean that proving the claims here would require "a different type of showing" than did the claims in *Bivens*, *see Ahmed*, 984 F.3d at 569 – one that would pose a greater risk of intruding on the investigatory and prosecutorial functions of the executive branch. *See Abbasi*, 137 S. Ct. at 1860 (listing "risk of disruptive intrusion" by the judiciary into other branches as potential difference). To succeed on his *Franks* claims, Annappareddy would have to establish that the defendants knowingly and intentionally or with reckless disregard for the truth made false statements or omissions in the warrant affidavit, and that those false statements or omissions were material to the magistrate judge's finding of probable cause. *See Evans v. Chalmers*, 703 F.3d 636, 650 (4th Cir. 2012). And to prevail on his Fourth Amendment false arrest claims, Annappareddy similarly would have to establish, among other things, that the defendants had "deliberately or with a reckless disregard for the truth" made material false statements or omissions, "undercut[ting] the grand jury's probable cause determination." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014). "*Bivens* did not require this type of fact-checking and conscience-probing, . . . which can, as the Supreme Court has warned, impose 'substantial costs.'" *Ahmed*, 984 F.3d at 569 (quoting

26

*Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)); *see also Farah*, 926 F.3d at 499 (finding new context because claim would require "probing executive charging decisions and peeking behind the curtain of customarily secret grand-jury proceedings").

Finally, we find it significant that the search warrants in this case ran against the corporate entity of Pharmacare, and not the plaintiff himself. The plaintiff in *Bivens*, of course, had himself been searched by the officers he was suing. There appear to be no cases – in the Supreme Court or any other court – approving a *Bivens* claim for acts taken against a corporate entity. Such a claim might well raise complex issues not at issue in *Bivens*, and further distinguish this case from the *Bivens* context. *Cf. Life Savers Concepts Ass'n of Cal. v. Wynar*, 387 F. Supp. 3d 989, 998–99 (N.D. Cal. 2019) (holding that corporate entity seeking to assert *Bivens* claim on behalf of employees presents new context under *Abbasi*).

When we take all of this together, we, like the district court, conclude that Annappareddy's Fourth Amendment claims are meaningfully different than those in *Bivens*, and, if permitted to proceed, would extend *Bivens* into a new context.

b.

That brings us to the second step of the *Abbasi* analysis, and whether any "special factors" counsel hesitation in extending the *Bivens* implied cause of action to Annappareddy's Fourth Amendment claims. *See Abbasi*, 137 S. Ct. at 1857–58. "The focus of the special-factors inquiry is 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" *Earle*, 2021 WL 896399, at *3 (quoting *Abbasi*, 137 S. Ct.

27

at 1858).  We agree with the district court that it is not, and that "any such remedy [must] come from Congress itself."  J.A. 532.

One special factor here is the existence of "an alternative remedial structure," even if it does not go so far as a *Bivens* remedy would.  *Abbasi*, 137 S. Ct. at 1858.  By itself, as the district court emphasized, that factor "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."  J.A. 529 (quoting *Abbasi*, 137 S. Ct. at 1858).  And as the Eighth Circuit explained in *Farah*, Congress indeed has created a distinct and limited set of remedies to compensate individuals who suffer as a result of wrongful governmental conduct in the course of criminal prosecutions.  *See Farah*, 926 F.3d at 501 (discussing statutory remedies allowing criminal defendants who prevail against "vexatious, frivolous, or . . . bad[-]faith" government litigating positions to recover attorneys' fees and providing cause of action for those who were wrongfully convicted (quoting Act of Nov. 26, 1997, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (codified at 18 U.S.C. § 3006A note))).  "The fact that Congress has expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice," *id.* at 502 – and counsels against us stepping in to create a "freestanding remedy in damages" here, *id.* (quoting *Abbasi*, 137 S. Ct. at 1858).

Also counseling hesitation is the risk that a *Bivens* action for these Fourth Amendment claims would require courts to interfere in the executive branch's investigative and prosecutorial functions.  *See Abbasi*, 137 S. Ct. at 1861 (considering whether a *Bivens* action "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch").  As the district court explained, the Fourth Amendment allegations

28

here, charging concerted action by numerous investigators and prosecutors, arise out of a complex and multi-agency investigation into the billing practices and inventories of several pharmacies in different states. J.A. 526–28. And the complaint alleges that the same basic acts of wrongdoing – the purposeful manipulation of a complicated analysis of Pharmacare's inventory and invoices to produce fabricated medication shortages – supported not only the securing of a warrant against Pharmacare locations, but also a grand jury indictment against Annappareddy. Under those circumstances, we do not see how evaluating Annappareddy's Fourth Amendment claims could avoid "a wide-ranging dive into all actions taken by each actor as well as all evidence available to investigators, prosecutors, judges, and juries." J.A. 530; *see Farah*, 926 F.3d at 500 (identifying as "special factor" need for "wide-ranging inquiry into the evidence available to investigators, prosecutors, and the grand jury").

Annappareddy urges us to isolate his *Franks* claim from his intertwined allegations, and to focus on that alone. And when it comes to *Franks*, Annappareddy argues, there is nothing "special" about the inquiry into material falsity and probable cause that would be required; indeed, courts routinely undertake that inquiry in § 1983 cases raising *Franks* claims against state officers. Again, we are not convinced that the *Franks* claim here can be separated cleanly from Annappareddy's other constitutional claims. And while we of course do not doubt that federal courts are capable of adjudicating *Franks* claims under § 1983, that is not the end of the inquiry under *Abbasi*: In the § 1983 context, it is "*Congress*," and not a court, that has "balanced the costs and benefits and decided that the

29

potential encroachment" on executive authority that comes along with a *Franks* inquiry is worth the price. *Farah*, 926 F.3d at 501.

In short, we agree with the district court that "special factors" counsel against extension of an implied cause of action into this new *Bivens* context. That does not mean that we can think of no policy reasons for making such a remedy available. But it does mean that "whether a damages action should be allowed is a decision for the Congress to make, not the courts." *Abbasi*, 137 S. Ct. at 1860.

**B.**

We turn now to the appeal of state prosecutor Catherine Pascale, challenging the district court's determination that she is not entitled to absolute prosecutorial immunity against charges, brought under Maryland state law, that she both fabricated and destroyed evidence. For the reasons given below, we agree with Pascale that she is shielded by prosecutorial immunity and that the state-law charges against her must be dismissed.[10]

---

[10] Following the district court's dismissal of the *Bivens* claims and other determinations not at issue on appeal, there remained three Maryland-law claims against Pascale: claims for intentional infliction of emotional distress, for violations of Annappareddy's state constitutional right to due process, and for civil conspiracy. It is not entirely clear which factual predicates – evidence fabrication, evidence destruction, or both – the district court permitted to go forward under each. But we read the district court order as allowing, at a minimum, pursuit of the intentional infliction of emotional distress claim with respect to both those predicates, and so we address both here. And because we find that Pascale is absolutely immune as to both, regardless of the cause of action, there is no need to disentangle this matter further.

30

1.

Again, we begin with the legal context for Pascale's assertion of immunity. As the district court explained, Maryland has adopted the federal doctrine of absolute prosecutorial immunity. J.A. 537 (citing *Gill*, 724 A.2d 88). Under that doctrine, "absolute immunity safeguards the process, not the person," and so extends only to actions "intimately associated with the judicial phase of the criminal process." *Nero*, 890 F.3d at 117–18 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)). To determine whether an act is so "intimately" associated with the judicial phase that it warrants absolute immunity, courts take a "functional approach," *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993), looking to the "nature of the function performed" and not the "identity of the actor who performed it," *Nero*, 890 F.3d at 118 (quoting *Buckley*, 509 U.S. at 269). Even a prosecutor, that is, will be entitled only to qualified immunity, rather than absolute immunity, if she is performing a function that is not tied to the judicial phase of the process. *Buckley*, 509 U.S. at 273.

In applying this functional approach, the timing of a prosecutor's conduct is a key factor. *See id.* at 274–75. Actions taken by a prosecutor *after* a probable-cause determination has been made generally are classified as "advocative" functions, *Nero*, 890 F.3d at 118 – "relat[ing] to an advocate's preparation for the initiation of a prosecution or for judicial proceedings" – that trigger absolute immunity, *Buckley*, 509 U.S. at 272–73. That includes, of course, the presentation of evidence at trial, or before a grand jury after a decision to seek an indictment is made. *Id.* at 273. By contrast, actions taken *before* probable cause is established are more likely to be "investigative" in nature – the same kind

31

of function normally performed by detectives or police officers – and therefore protected only by qualified immunity. *Id.* Thus, in *Buckley*, the Court denied absolute prosecutorial immunity to prosecutors who allegedly manufactured false evidence "during the preliminary investigation of an unsolved crime," because "[t]heir mission at that time was entirely investigative." *Id.* at 274–75.

We recognize that when absolute prosecutorial immunity applies – as we find it does here – it may in some cases lead to unfair results, "leav[ing] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler*, 424 U.S. at 427. But as we have explained, the Supreme Court has concluded that "important public policy justification[s]" outweigh these harms. *Savage v. Maryland*, 896 F.3d 260, 268 (4th Cir. 2018) (internal quotation marks omitted). "The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Nero*, 890 F.3d at 117 (quoting *Imbler*, 424 U.S. at 424–25). And without immunity, this threat of damages could "predispose prosecutors to bring charges based not on merit but on the social or political capital of prospective defendants." *Id.* So whatever the perceived equities of a particular case, we protect the judicial process as a whole by affording complete immunity to a prosecutor's advocative functions.

2.

We turn now to Annappareddy's claims against Pascale, beginning with the claim that she fabricated evidence. Specifically, Annappareddy's complaint alleges that after the superseding indictment was returned against him in March of 2014, Pascale, along with

32

prosecutor Wilkinson, first learned of the flaws in the MEDIC analysis of Pharmacare's inventory, which purported to find medication "shortages" indicating that Pharmacare was billing for prescriptions it never delivered. That summer, according to Annappareddy – about a year after the original July 2013 indictment against him, and months after the superseding indictment – Pascale participated in the fabrication of a new inventory analysis, which produced the same false "shortage" and "loss" figures as the old one, and was used at trial to convict Annappareddy. J.A. 157, 159.

We readily conclude that under *Buckley*'s functional analysis, these allegations go to Pascale's "advocative" role and are sufficiently tied to the "judicial process" to warrant absolute prosecutorial immunity. Generously construed, Annappareddy's complaint alleges wrongdoing on Pascale's part that occurred only after he had been identified as a suspect, after probable cause had been established, and after he had been twice indicted.[11] Indeed, the complaint avers expressly – twice – that at earlier periods in the proceedings, Pascale and her fellow prosecutor were unaware of the fabrication of false evidence and its presentation to two grand juries. And were there any doubt on this score, Annappareddy's

---

[11] We think there is some question whether the complaint sufficiently alleges the involvement of Pascale – as opposed to Wilkinson, the other prosecutor – in any evidence fabrication at all: The complaint's specific allegations deal exclusively with Wilkinson or point to Wilkinson as spearheading the relevant investigations. *Cf. Nero*, 890 F.3d at 120 n.4 (declining to assume as true "conclusory allegations" of prosecutorial misconduct during investigative stage of proceeding). But at this early stage of the litigation, we will read the complaint generously, as sufficiently implicating Pascale in the evidence-fabrication allegations.

counsel resolved it at oral argument, effectively conceding that all the allegations against Pascale concerned post-indictment conduct.

In the context of this case, that is enough to establish that Pascale's alleged evidence fabrication was undertaken in her "advocative" capacity, in preparation for the trial that was about to begin, and not as an "investigator" seeking probable cause for an arrest or indictment. *See Buckley*, 509 U.S. at 273–74; *see also, e.g.*, *Cousin v. Small*, 325 F.3d 627, 635 (5th Cir. 2003) (holding that prosecutor's alleged solicitation of false testimony was protected by absolute immunity because suspect already was identified and probable cause already was established); *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995) (explaining that whether alleged fabrication of evidence was "advocative" or "investigative" turned on whether probable cause already had been established). To be sure, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5. But here, the specific allegation against Pascale is that she began to take a "more hands-on approach" in anticipation of *trial*, once she realized that the existing MEDIC inventory analysis was "not nearly as favorable [to] the government" as she had expected. J.A. 154, 157. This is not the hypothetical post-indictment "police investigative work" reserved by the Court in *Buckley*. *See* 509 U.S. at 274 n.5. Instead, it falls squarely on the trial-preparation side of the line. *See Cousin*, 325 F.3d at 635 (holding that prosecutor acts as advocate in connection with interview "intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect"); *Savage*, 896 F.3d at 269 (describing advocative role as "encompass[ing] acts undertaken

34

by a prosecutor in *preparing for . . .* trial – including, specifically, the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial" (internal citation and quotation marks omitted)).  Because Pascale was acting in her role as advocate when she allegedly fabricated evidence for use at trial, she is shielded by absolute prosecutorial immunity.

3.

Finally, we turn to Annappareddy's allegation that Pascale participated in the destruction of exculpatory evidence.  According to the complaint, while Annappareddy's motion for a new trial was pending, Pascale, in concert with other defendants, destroyed three boxes of documents – documents that would have confirmed that Pharmacare indeed had filled the prescriptions for which it had billed, and, conversely, that the government had relied on false inventory analysis to prove otherwise at trial.  This claim, too, we hold, goes to actions taken in an "advocative" capacity and is therefore barred by absolute prosecutorial immunity.

It is well established – and the parties here agree – that the failure to disclose exculpatory evidence while a criminal proceeding is pending is an "advocative" function protected by absolute immunity.  As the Supreme Court explained in *Imbler*, the "deliberate withholding of exculpatory information," even if unconstitutional, is considered part of the prosecutorial role for immunity purposes.  *See* 424 U.S. at 431 n.34; *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 344–45 (2009) (explaining that prosecutors "enjoy absolute immunity" for failure to disclose evidence, because such conduct necessarily involves preparation for trial and the evidence presented at trial).  As a result, we and other circuits

35

routinely hold that prosecutors are shielded by absolute immunity from claims that they deliberately withheld materially exculpatory evidence at any point in a criminal proceeding. *See Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (applying absolute immunity to failure to disclose exculpatory evidence during post-conviction and appellate proceedings); *see also, e.g.*, *Reid v. New Hampshire*, 56 F.3d 332, 336 (1st Cir. 1995) ("[U]nder *Imbler*, it is now [a] well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information.").

The question in this case, then, is whether there is something about Annappareddy's claim that evidence was destroyed – rather than withheld – that would bring it outside this well-established rule. The district court thought this case was different because, "viewing the [complaint's] allegations in the light most favorable" to Annappareddy, the decision to discard the boxes in question was made "as part of a general cleanup" and was thus purely "administrative" and unconnected to any advocative function. J.A. 536; *see Van de Kamp*, 555 U.S. at 342 (explaining that absolute immunity may not apply when prosecutor is engaged in "administrative" tasks); *Imbler*, 424 U.S. at 431 n.33 (distinguishing between advocative and administrative functions). We do not think Annappareddy's complaint can bear that reading. What Annappareddy is alleging is not an innocent mistake made in the course of an office cleanup; it is that Pascale and the other defendants purposefully shredded three boxes of evidence, singling out for "covert, selective, and intentional" destruction "unique exculpatory documents" so that they could not be used by Annappareddy at a retrial or to expose the defendants' original wrongdoing. J.A. 162–65.

And indeed, Annappareddy does not meaningfully defend the "office cleanup" theory on appeal, perhaps because it would so badly undermine the thrust of his actual allegations.[12]

Instead, Annappareddy argues that although the *failure to disclose* exculpatory evidence is advocative in nature and thus protected by absolute immunity, the *destruction* of exculpatory evidence is not. The failure to furnish evidence to the defense, Annappareddy recognizes, involves an exercise of prosecutorial discretion that bears on the evidence that will be introduced during judicial proceedings. But once that decision has been made, he argues, the advocative function comes to an end, and the actual disposal of that evidence implicates only ministerial or custodial functions.

We do not think this is a meaningful distinction. Claims that evidence has been intentionally withheld and claims that evidence has been destroyed often will be two sides of the same coin, with one easily reframed as the other. *See Imbler*, 424 U.S. at 431 n.34 (finding proposed distinction between use of perjured testimony, protected by absolute immunity, and withholding of evidence is "not susceptible of practical application"). The Ninth Circuit rejected a similar distinction in finding that a prosecutor's release of exculpatory evidence, predictably leading to its destruction, was shielded by absolute immunity: In deciding whether to preserve the evidence or allow its destruction, "the

---

[12] Pascale also argues that even if the complaint could be read to allege the performance of an "administrative" task, the destruction of evidence at issue would be the kind of administrative task – directly associated with the judicial process, and requiring legal knowledge and the exercise of discretion – that might still be protected by absolute immunity. *See Van de Kamp*, 555 U.S. at 344. Because we do not think the complaint can be read that way, we have no occasion to pass on this contention.

37

primary consideration, viewed objectively, is whether the prosecutor needs the evidence to prosecute" – a decision that "goes to the heart of the advocate's role 'in initiating a prosecution and in presenting the State's case.'" *Ybarra v. Reno Thunderbird Mobile Home Vill.*, 723 F.2d 675, 679 (9th Cir. 1984) (quoting *Imbler*, 424 U.S. at 431); *see also Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978) (holding that claim against prosecutors for destruction of exculpatory evidence is barred by absolute prosecutorial immunity). We agree. Under the functional approach of cases like *Imbler*, what matters is the decision to withhold exculpatory evidence from a defendant and the judicial process. *See* 424 U.S. at 431 n.34; *Van de Kamp*, 555 U.S. at 345. That decision is made in an "advocative" capacity whether or not it is accompanied by the evidence's destruction.[13]

---

[13] We recognize that there is one case, *Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir. 2006), in which a federal circuit has distinguished between withholding and destroying evidence for purposes of prosecutorial immunity. For the reasons given above, we are not persuaded that this is a workable distinction. But in any event, we note that the reasoning of *Yarris* – that "[o]nce the decision is made not to furnish evidence to the defense, no additional protectible prosecutorial discretion is involved in deciding to dispose of it," *id.* at 136–37 (internal quotation marks omitted) – is a bad match for this case. Here, the destroyed materials were properly disclosed prior to Annappareddy's first trial, though neither the government nor the defense made use of them. And Annappareddy does not allege that at the time of the destruction, the defendants already had made some independent decision not to disclose the documents in the future. Instead, it is the destructive act itself, according to the complaint, that reflected a deliberate decision to deprive Annappareddy of "unique exculpatory documents" while his new trial motion was pending. *See* J.A. 164.

**III.**

For the reasons given above, the judgment of the district court is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*